NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12344

COMMONWEALTH  vs.  ROGELIO R. BUCKLEY.


Plymouth.     October 5, 2017. - February 14, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Controlled Substances.  Constitutional Law, Search and seizure,
    Reasonable suspicion, Investigatory stop.  Search and
    Seizure, Threshold police inquiry, Reasonable suspicion,
    Consent, Motor vehicle.  Threshold Police Inquiry.
    Practice, Criminal, Motion to suppress.



    Indictments found and returned in the Superior Court
Department on April 19, 2013.

    A pretrial motion to suppress evidence was heard by
Cornelius J. Moriarty, II, J., and the cases were tried before
Richard J. Chin, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Matthew Malm for the defendant.
    Mary E. Lee, Assistant District Attorney, for the
Commonwealth.
    The following submitted briefs for amici curiae:
    Ivan Espinoza-Madrigal, of New York, Oren M. Sellstrom, &
Oren N. Nimni for Lawyers' Committee for Civil Rights and
Economic Justice & others.

Rebecca Kiley, Committee for Public Counsel Services, & Derege B. Demissie for Committee for Public Counsel Services & another.

Jeff Goldman, Vanessa M. Brown, Matthew R. Segal, Rahsaan D. Hall, Jessie J. Rossman, & Carlton E. Williams for American Civil Liberties Union of Massachusetts.

Daniel F. Conley, District Attorney, & John P. Zanini, Cailin M. Campbell, & David D. McGowan, Assistant District Attorneys, for District Attorney for the Suffolk District.

CYPHER, J.   In this appeal we are asked to reconsider one tenet of our search and seizure jurisprudence:  that a traffic stop constitutes a "reasonable" "seizure" for purposes of art. 14 of the Massachusetts Declaration of Rights where a police officer has observed a traffic violation, notwithstanding the officer's underlying motive for conducting the stop.  See Commonwealth v. Santana, 420 Mass. 205 (1995).  For the sound legal and practical reasons discussed below, we decline to depart from that tenet as the general standard governing the validity of traffic stops under art. 14.  We affirm the denial of the defendant's motion to suppress, and we also affirm the judgment of conviction.

Facts. We recount the facts found by the motion judge, supplemented by uncontroverted testimony at the motion hearing. Commonwealth v. Cordero, 477 Mass. 237, 238 (2017). On January 25, 2013, Whitman police Detectives Joseph Bombardier and Eric Campbell were conducting surveillance of a three-unit apartment building out of which they suspected drug activity was

being conducted.[1]  At approximately 10:50 P.M. that evening, the detectives observed a vehicle park nearby, and its two occupants enter the building.  Those same two individuals reemerged a few minutes later, returned to the vehicle, and drove away without the vehicle's headlights on.  Bombardier instructed fellow Officer Gary Nelson to stop the vehicle for suspected drug activity.  Nelson did so a few minutes later, upon observing the vehicle traveling above the speed limit along a road in Whitman.[2]  Nelson radioed Bombardier that he had stopped the vehicle.

When the detectives arrived, Nelson was standing at the vehicle's driver's side.  Bombardier likewise approached the driver, and in doing so he noticed a strong odor of marijuana emanating from inside the vehicle.  Bombardier asked the driver if she had any marijuana in the vehicle.[3]  She told him that she

---

[1] Detective Joseph Bombardier had received complaints from one of the apartment's residents concerning heavy foot traffic going in and out of the building at all hours.  Bombardier determined that another of the building's residents had previously been charged with drug-related offenses.  He therefore decided to conduct surveillance of the building, and suspected, based on his training and experience, that drug activity was being conducted out of the building.

[2] Officer Gary Nelson testified that he measured the vehicle traveling forty-two miles per hour in a thirty mile per hour zone.  There is no testimony indicating that the vehicle's lights were still off at the time of the traffic stop.

[3] This stop occurred after the decriminalization of marijuana possession under State law and this court's opinion in

did not think so, and said that he could check. After instructing the driver to step out, Bombardier used his flashlight to search the interior of the driver's seat area. Finding nothing, he directed Campbell to ask the front seat passenger, the defendant, to leave the vehicle. When the defendant stepped out, Campbell observed what he believed to be a firearm under the front passenger seat.[4] The officers arrested the defendant and the driver, placed them in separate cruisers, and advised them of the Miranda rights. Another officer later observed a plastic bag on the floor of the cruiser between the defendant's feet that appeared to contain "crack" cocaine. The defendant was subsequently indicted for possession with the intent to distribute cocaine, as well as with firearm offenses and other offenses with enhanced penalties.

Prior to trial, the defendant moved to suppress the evidence seized during the traffic stop. The motion judge held an evidentiary hearing, and thereafter, he denied the defendant's motion. In April, 2015, a jury convicted the defendant on the lesser included offense of cocaine possession,

---

Commonwealth v. Cruz, 459 Mass. 459 (2011), which held that, in light of the changed status of marijuana, "the odor of burnt marijuana alone no longer constitutes a specific fact suggesting criminality." Commonwealth v. Overmyer, 469 Mass. 16, 20 (2014), citing Cruz, supra at 469-472.

[4] The defendant does not challenge the officer's testimony that he saw a firearm.

and he was sentenced to one year in jail.  The defendant timely filed this appeal from the judgment of conviction, and on appeal, he challenges only the denial of his pretrial motion to suppress.

Discussion.[5]  The defendant challenges the denial of his motion to suppress on three grounds.  First, he argues that the evidence against him should be suppressed as the product of a pretextual stop, where the Whitman officers stopped the vehicle the defendant occupied not because it was speeding, but because the police suspected that its occupants were involved in drug activity.  The defendant contends that all such pretextual stops, which generally are legitimated on the basis of an observed civil traffic violation yet motivated by a desire to investigate suspected criminal wrongdoing as to which the police lack reasonable suspicion or probable cause to justify an

---

[5] We acknowledge the briefs submitted by the following amici curiae:  Lawyers' Committee for Civil Rights and Economic Justice, Urban League of Eastern Massachusetts, Charles Hamilton Institute for Race and Justice, Massachusetts Law Reform Institute, Union of Minority Neighborhoods, Boston Police Camera Action Team, GLBTQ Legal Advocates & Defenders, MassEquality, The Network/La Red, Interact:  Advocates for Intersex Youth, Theater Offensive, Greater Boston PFLAG, Centro Presente, Brazilian Worker Center, Justice at Work, Justice Resource Institute, Jewish Alliance for Law and Social Action, Massachusetts Associate of Hispanic Attorneys, and Massachusetts Black Lawyers Association; Committee for Public Counsel Services and Massachusetts Association of Criminal Defense Lawyers; American Civil Liberties Union of Massachusetts, Inc.; and the District Attorney for the Suffolk District.

investigatory stop, violate art. 14 and its protection against unreasonable seizures.[6]  On this point, the defendant asks that we overturn our decision in Santana, 420 Mass. 205, which holds that an observed traffic violation is itself a lawful basis for the police to conduct a traffic stop regardless of the officer's underlying motive.

Second, the defendant argues that the police impermissibly expanded the scope of the stop when detectives Bombardier and Campbell approached the vehicle during Nelson's traffic inquiry and asked the driver about the smell of marijuana.  Last, the defendant challenges the motion judge's finding that the driver's consent to the search of the vehicle was freely and voluntarily given.

We review these arguments in turn.  In doing so, "we adopt the motion judge's subsidiary findings of fact absent clear error, but we independently determine the correctness of the judge's application of constitutional principles to the facts as found."  Commonwealth v. Catanzaro, 441 Mass. 46, 50 (2004).

1.  Pretext.  The parties dispute, as a threshold matter, whether the defendant adequately raised this issue before the motion judge.  We conclude that he did.  The first section of

_____

[6] The Commonwealth conceded that the Whitman police did not have reasonable suspicion of criminal activity justifying an investigatory stop.  We do not address whether this was a necessary concession and focus exclusively on the asserted legal basis for the stop, an observed traffic violation.

the defendant's memorandum of law in support of his motion to suppress asserted that "[t]he car stop was effectuated so that the occupants could be identified and the car searched."  The motion judge's written opinion likewise acknowledged "[t]he defendant['s] argu[ment] that the stop for the traffic offense was a pretext."  The fact that the defendant did not specifically state that he challenged the continued viability of Santana does not preclude our review of this issue, given both its treatment below and the fact that the motion judge was bound to apply Santana regardless of the defendant's position.  See generally Commonwealth v. Vasquez, 456 Mass. 350, 357-358 (2010).[7]

Article 14, like the Fourth Amendment to the United States Constitution, guarantees "a right to be secure from all unreasonable searches[] and seizures."[8]  Because "[a] police stop of a moving automobile constitutes a seizure," Commonwealth v.

_____

[7] This is not to say that challenges to established law need not be raised during trial court proceedings in order for them to be entertained on appeal.  Such arguments still must be raised below.  See, e.g., Commonwealth v. Barnes, 399 Mass. 385, 393-394 (1987) (appellate court not obliged to consider grounds argued on appeal but not raised in motion to suppress).

[8] Article 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution are distinct sources of this right to be free from arbitrary government action, and in some circumstances, "art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause." Commonwealth v. Upton, 394 Mass. 363, 373 (1985).

Rodriguez, 472 Mass. 767, 773 (2015), that stop must be reasonable in order to be valid under the Fourth Amendment and art. 14. A passenger in a vehicle may challenge the constitutionality of a stop. See Commonwealth v. Quintos Q., 457 Mass. 107, 110 (2010), citing Brendlin v. California, 551 U.S. 249, 251 (2007).

In Santana, 420 Mass. at 209, we articulated the current State constitutional standard for evaluating the validity of a traffic stop. Under that rule, called the authorization approach, a traffic stop is reasonable for art. 14 purposes "so long as the police are doing no more than they are legally permitted and objectively authorized to do," regardless of the underlying intent or motivations of the officers involved. Santana, supra, quoting United States v. Trigg, 878 F.2d 1037, 1041 (7th Cir. 1989), cert. denied sub nom. Cummins v. United States, 502 U.S. 962 (1991).[9] Stated differently, under the authorization test, a stop is reasonable under art. 14 as long as there is a legal justification for it. We have long held that an observed traffic violation is one such justification. See, e.g., Commonwealth v. Bacon, 381 Mass. 642, 644 (1980) ("Where the police have observed a traffic violation, they are

---

[9] One year after Santana, the United States Supreme Court decided Whren v. United States, 517 U.S. 806, 811-813 (1996), in which the Court adopted an identical test for evaluating the reasonableness of a traffic stop under the Fourth Amendment.

warranted in stopping a vehicle"); Commonwealth v. Amado, 474 Mass. 147, 151 (2016) (valid stop where "unlit registration plate"); Commonwealth v. Feyenord, 445 Mass. 72, 75 (2005), cert. denied, 546 U.S. 1187 (2006) (valid stop where inoperable headlight in daylight); Santana, 420 Mass. at 207 (valid stop where defective taillight). Cf. Commonwealth v. Lora, 451 Mass. 425, 436 (2008), quoting Whren v. United States, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable for Fourth Amendment purposes 'where the police have probable cause to believe that a traffic violation has occurred'"). As Santana makes clear, the authority to conduct a traffic stop where a traffic violation has occurred is not limited by "[t]he fact that the [police] may have believed that the [driver was] engaging in illegal drug activity." 420 Mass. at 208.

In the defendant's view, however, evaluating the reasonableness of a traffic stop on the basis of legal justification alone is not enough, because this creates the risk that the police might use an observed traffic violation as a pretext for investigating other suspected wrongdoing.[10] In place

---

[10] The defendant's general position against pretextual traffic stops mirrors that of the petitioners in Whren, 517 U.S. at 810, which the Supreme Court succinctly summarized: "[The petitioners] argue . . . that 'in the unique context of civil traffic regulations' probable cause [to believe that a traffic violation has occurred] is not enough. Since, they contend, the use of automobiles is so heavily and minutely regulated that total compliance with traffic and safety rules is nearly

of the authorization test, the defendant seeks a new art. 14 standard for traffic stops that looks beyond objective legal justification in order to examine the police's underlying motives for conducting the stop. Specifically, the defendant asks that when considering a motion to suppress a judge should examine whether a given traffic stop was only a pretext for the police's underlying "true" motive to investigate suspected criminal conduct, as to which the police lacked the requisite reasonable suspicion or probable cause to justify a bona fide investigatory stop. As the primary basis for this position, the defendant relies on a series of cases and academic articles discussing the connections between traffic stops and racial profiling. He also argues that because Massachusetts courts have considered the issue of pretext when evaluating the reasonableness of inventory or administrative searches, so too should they consider pretext when analyzing the validity of traffic stops. Before addressing these specific points, we examine the underpinnings of Santana's authorization test.

Santana is predicated on the general constitutional principle, reflected in both art. 14 and Fourth Amendment jurisprudence, that "police conduct is to be judged 'under a

---

impossible, a police officer will almost invariably be able to catch any given motorist in a technical violation. This creates the temptation to use traffic stops as a means of investigating other law violations, as to which no probable cause or even articulable suspicion exist."

standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved.'" Santana, 420 Mass. at 208, quoting Commonwealth v. Ceria, 13 Mass. App. Ct. 230, 235 (1982).[11] See Lora, 451 Mass. at 436, quoting Whren, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis"); Ceria, supra, and cases cited. Evaluating the validity of police conduct on the basis of objective facts and circumstances, without consideration of the subjective motivations underlying that conduct, is justified in part based on the significant evidentiary difficulties such an inquiry into police motives would often entail. This would require that courts discern not only whether the police initially possessed some underlying motive that failed to align with the legal

---

[11] We have applied this same standard of objective reasonableness when assessing, for instance, the validity of a Terry-type investigatory stop, Commonwealth v. Smigliano, 427 Mass. 490, 493 (1998) ("Because the facts and circumstances known to the officer are sufficient to create a reasonable suspicion . . . in a reasonable police officer, a Terry stop is justified regardless of the officer's subjective state of mind"); the reasonableness of a search conducted pursuant to the emergency aid exception, Commonwealth v. Tuschall, 476 Mass. 581, 584-585 (2017) (officers must possess "an objectively reasonable basis" for conclusion that intervention is necessary to save someone who is injured or in imminent danger); and the appropriate scope of a consent-based search, Commonwealth v. Gaynor, 443 Mass. 245, 255 (2005), quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991) (scope determined based on "objective reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

justification for their actions, but also whether the police were acting on that "improper" motive (i.e., the pretext), as opposed to the "proper" motive, when engaging in the challenged action.  Both judges and legal commentators have questioned the ability of courts -- venues of limited insight -- to reach accurate and satisfactory answers to these questions, which may be more appropriately handled by psychologists or philosophers than lawyers.  See, e.g., United States v. Arra, 630 F.2d 836, 845, n.12 (1st Cir. 1980) (one "problem" with this subjective approach is "the premium it would place on dissemblance," and that "it may be little more than guesswork for a court to determine what the true motivation was"); 1 W.R. LaFave, Search and Seizure § 1.4(e) (5th ed. 2012) (there is "no reason to believe that courts can with any degree of success determine in which instances the police had an ulterior motive," and "[p]resence of an ulterior motive may show why an officer might want to depart from the usual procedure but does not show that he has done so").

The authorization test avoids this often-speculative probing of the police's "true" motives, while at the same time providing an administrable rule to be applied by both law enforcement in the field as well as reviewing courts.  Like its Federal counterpart, art. 14 must often "be applied on the spur (and in the heat) of the moment, and the object in implementing

its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." Atwater v. Lago Vista, 532 U.S. 318, 347 (2001). The bright-line standard of legal justification achieves this by clarifying exactly when the police may conduct a traffic stop: where an officer has observed a traffic violation. "If this were not so, [a traffic stop's] validity could not be settled until long after the event; it would depend not only on the psychology of the arresting officer but on the psychology of the judge." United States v. McCambridge, 551 F.2d 865, 870 (1st Cir. 1977).[12]

Moreover, this rule also ensures that the same constitutional protections under art. 14 are afforded to all Massachusetts drivers where the same factual circumstances are present. As we observed in Santana, "the defendants' contention might yield the illogical result of allowing stops of nonsuspect drivers who violate motor vehicle laws, but forbidding stops of suspected criminals who violate motor vehicle laws." Santana,

---

[12] The United States Court of Appeals for the First Circuit also noted that a rule of reasonableness that hinges on the purity of law enforcement intentions may be all too easily manipulated: "As law enforcement personnel learn that a particular motivation is improper because it will render an otherwise valid search invalid, they may not have difficulty convincing themselves that their conduct was prompted not by the improper reason but the proper one." United States v. Arra, 630 F.2d 836, 845 n.12 (1st Cir. 1980).

420 Mass. at 210 n.3.  Application of the exclusionary rule in these circumstances, as the defendant requests, would be contrary to that rule's purpose, which is to "deter intentional unconstitutional behavior."  Lora, 451 Mass. at 439.  Its effect here would be to deter the police from carrying out one of their primary objectives:  investigating, within permissible legal boundaries, suspected criminal behavior.

Beyond these legal and practical justifications, Santana's authorization test is grounded in sound policy.  We have noted that "allowing police to make [traffic] stops serves [the] significant government interest" of ensuring public safety on our roadways.  Rodriguez, 472 Mass. at 776.  As Rodriguez more fully explains:

> "[M]any of our traffic violation statutes regulate moving cars and relate directly to the promotion of public safety; even those laws that have to do with maintaining a vehicle's equipment in accordance with certain standards may also be safety-related. . . .  Permitting stops based on reasonable suspicion or probable cause that these laws may have been violated gives police the ability to immediately address potential safety hazards on the road.  Thus, although a vehicle stop does represent a significant intrusion into an individual's privacy, the government interest in allowing such stops for the purpose of promoting compliance with our automobile laws is clear and compelling" (citation omitted).

Id. at 776-777.  Therefore, the fact that a traffic law has been violated is, generally speaking, a legally sufficient basis to justify stopping a vehicle, irrespective of any additional suspicions held by the officer(s) conducting the stop.  See,

e.g., Commonwealth v. Cruz, 459 Mass. 459, 465 (2011) ("officers validly 'stopped' the car for parking in front of a fire hydrant, a civil traffic violation . . . . Thus, the officers' presence at the side of the car was appropriate" [citations omitted]); Santana, 420 Mass. at 210 ("By driving an automobile with a broken taillight, the defendants took the risk of being stopped"). In that sense a traffic stop cannot be "arbitrary," because it is predicated on a driver violating a traffic law.[13]

Still, the defendant urges that we overturn Santana on the ground that the authorization test countenances pretextual stops -- and more specifically, stops motivated by the race of the driver (i.e., racial profiling). In the defendant's view, this court's previous attempt to address the problem of racial bias in traffic stops, Lora, 451 Mass. at 444-447, has failed to provide a meaningful remedy. Lora held that where a driver produces "sufficient evidence to raise a reasonable inference," id. at 442, that the stop at issue "is the product of the selective enforcement predicated on race," evidence seized in the course of that stop must be suppressed under the exclusionary rule. Id. at 440. The surest way to effectively remedy that issue now, the defendant contends, is simply to do away with Santana's authorization test, and instead hold that

_____

[13] We have also recognized that "[a]n arrest or prosecution based on probable cause is ordinarily cloaked with a presumption of regularity." Lora, 451 Mass. at 437.

all pretextual stops, regardless of the particular motive (whether it be the race of a driver, or, as here, a desire to investigate suspected criminal wrongdoing) violate art. 14. There are at least two deficiencies in this argument.

First, to the extent the defendant appeals to our consideration of the motivations underlying a traffic stop in the racial profiling context as a basis for doing so in this and similar cases, he ignores any distinction between art. 14 and the equal protection principles of arts. 1 and 10 of the Massachusetts Declaration of Rights.  In Lora we observed that racial profiling "is at base a claim that [the police] selectively enforced the laws in contravention of the Fourteenth Amendment and arts. 1 and 10." Lora, 451 Mass. at 436.  We permitted inquiry into officers' subjective motives in that case because Lora, unlike Santana or Whren, "involved a challenge to [a] traffic stop[] based on equal protection grounds."  Lora, supra.  At the same time, we observed that "'[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis.'  Our holding in [Santana] is not to the contrary." Id., quoting Whren, 517 U.S. at 813.  See Lora, supra, quoting Whren, supra ("the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment").  Thus, Lora makes clear that to the extent we do consider the purpose

of a stop when assessing its validity, we do so pursuant to the equal protection principles of arts. 1 and 10 -- not art. 14's guarantee against unreasonable seizures -- and only where a driver has alleged that race was the reason for the stop.

This brings us to the more obvious deficiency in the defendant's appeal to the racial profiling context:  the fact that racial profiling is not an issue in this case.  Unlike the Lora defendant, the defendant here has raised no allegation of impermissible discrimination, and he does not challenge the traffic stop on equal protection grounds.  To the contrary, he acknowledges in his brief that he is "is not arguing (and has never argued) that he was racially profiled"[14] (emphasis added). Although we certainly do not dispute, as a general matter, the enormity or relevance of the problem of racial profiling, it is not an appropriate basis for overturning our general art. 14 standard governing the reasonableness of traffic stops where the defendant has expressly disavowed any such argument that race was a factor in the stop at issue.

At the same time, the defendant and the concurring Justice raise considerable, legitimate concerns regarding racial profiling and the impact of such practices on communities of color.  We share these sentiments, which echo those expressed by

---

[14] The defendant is an African-American male; the driver is a Caucasian female.

past members of this court.  See, e.g., Lora, 451 Mass. at 444, and cases cited ("Justices of this court have expressed considerable concern about the practice of racial profiling in prior decisions").  We likewise acknowledge their valid questions regarding the lasting efficacy of Lora for addressing the issue of pretextual stops motivated by race, given that in the near-decade since that decision, we are not aware of a single reported case suppressing evidence under its framework.  We take this opportunity to encourage lawyers to use the Lora framework in cases where there is reason to believe a traffic stop was the result of racial profiling.  To the extent we must review the adequacy of our decision in Lora, however, or address these issues in depth, we wait to do so in a case where a driver has actually alleged and laid a proper foundation for a claim under Lora.  We cannot evaluate the efficacy of the Lora framework without a record.

As an alternative basis for his request that we overturn Santana, the defendant cites cases from "other areas of criminal law" where he contends Massachusetts courts "identify pretext" -- namely, searches conducted for the purposes of inventory or administrative regulation.  But the defendant's conclusion that "there is no good reason for the distinction" between the constitutional analysis in these cases versus traffic stops ignores at least one reason.  Inventory and administrative

searches -- as distinct from traffic stops, which involve only a temporary seizure, see Rodriguez, 472 Mass. at 773 -- are unique in that they are conducted in the absence of probable cause or reasonable suspicion, for purely noninvestigatory reasons. See, e.g., Commonwealth v. Vuthy Seng, 436 Mass. 537, 550-555, cert. denied, 537 U.S. 942 (2002). In these contexts, the burden rests with the Commonwealth to demonstrate that the search "was conducted for some legitimate police purpose other than a search for evidence." Commonwealth v. Benoit, 382 Mass. 210, 219 (1981), S.C., 389 Mass. 411 (1983). From the start, then, consideration of an officer's "purpose" for conducting the search is relevant to an assessment of the lawfulness of the search itself. Thus, where it appears that the "sole purpose" of that search was in fact criminal investigation, rather than inventory or administrative regulation, any evidence unlawfully seized must be suppressed. See, e.g., Benoit, supra at 219 ("The record clearly reveals that the only purpose for the entry into this suitcase . . . was to seize evidence. The search and seizure without a warrant was, therefore, illegal"); Commonwealth v. Ortiz, 88 Mass. App. Ct. 573, 576-577 (2015) (affirming suppression of evidence found in course of inventory search where officer testimony showed that "sole purpose of impounding and searching the defendant's vehicle and its contents" was to search "for evidence of drug activity without a

warrant").[15]  A traffic stop poses no such question regarding the actual legal authority for the police conduct at issue, because, as mentioned, "[w]here the police have observed a traffic violation, they are warranted in stopping a vehicle."  Bacon, 381 Mass. at 644.  Cf. Whren, 517 U.S. at 811 (declining to import principles of cases "addressing the validity of a search conducted in the absence of probable cause" to cases involving "police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred").

Having considered the defendant's arguments, we decline to disturb our general rule that the reasonableness of a traffic stop under art. 14 is evaluated according to the authorization test articulated in Santana.  Outside of the racial profiling context -- as this case is -- the reasonableness of a traffic

---

[15] The defendant quotes extensively from Commonwealth v. Ortiz, 88 Mass. App. Ct. 573, 576-577 (2015), to argue that we should consider pretext here.  In Ortiz, the defendant, who was the subject of surveillance as part of an investigation into cocaine trafficking, was stopped and arrested for switching lanes without signaling; a subsequent inventory search of his vehicle yielded cocaine.  Id. at 575.  The arresting officer testified that he would not have conducted either the stop or the arrest absent the intention "to employ the inventory policy to search [a] backpack for drugs."  Id. at 576-577.  The Appeals Court affirmed the trial judge's suppression of the evidence on the ground that the inventory search "was simply a pretext for using the inventory policy to conduct an investigatory search." Id. at 577.  Significantly, however, the Appeals Court made no such determination regarding the validity of the initial stop; to the contrary, it correctly acknowledged that "the constitutional reasonableness of traffic stops 'does not depend on the actual motivations of the officer involved.'"  Id. at 575 n.5, quoting Whren, 517 U.S. at 813.

stop does not depend upon the particular motivations underlying the stop.  For the sound legal and practical reasons previously described, legal justification alone, such as an observed traffic violation, is sufficient.

Applying that principle here, the motion judge credited Nelson's testimony that before conducting the traffic stop at issue, Nelson observed the vehicle traveling above the speed limit.  We therefore affirm the judge's conclusion that "the stop was warranted by the observed traffic violation."  "The fact that the [police] may have believed that the defendants were engaging in illegal drug activity does not limit their power to make an authorized stop."  Santana, 420 Mass. at 208.

2.  Scope of the stop.  In addition to challenging the legality of the stop itself, the defendant argues that the Whitman police exceeded the permissible scope of the stop when the plainclothes detectives joined Nelson at the scene and asked the driver about the odor of marijuana emanating from the vehicle.  "In evaluating whether the police exceeded the permissible scope of a stop, the issue is one of proportion." Commonwealth v. Sinforoso, 434 Mass. 320, 323 (2001).  "The nature of the stop, i.e., for a traffic offense, defines the scope of the initial inquiry by a police officer."  Commonwealth v. Bartlett, 41 Mass. App. Ct. 468, 470 (1996).  See Commonwealth v. Cordero, 477 Mass. 237, 241 (2017) ("A routine

traffic stop may not last longer than reasonably necessary to effectuate the purpose of the stop" [quotations and citation omitted]). "Where an officer conducts an uneventful threshold inquiry giving rise to no further suspicion of criminal activity, he may not prolong the detention or expand the inquiry." Feyenord, 445 Mass. at 78 n.5.

As discussed, the stop at issue was justified based on Nelson's observation of the vehicle speeding. This defines the permissible scope of the officers' inquiry. The defendant fails to cite any authority suggesting that it was impermissible for the plainclothes detectives to join Nelson at the location of the stop. The stop remained constitutional so long as the officers did not exceed its permissible scope. There is nothing in the record to indicate that the "tasks tied to the traffic infraction . . . [were already] complete[]," Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015), by the time Bombardier and Campbell arrived, or that Nelson unnecessarily prolonged the stop to await the detectives' arrival. See Cordero, 477 Mass. at 242 ("The police do not earn 'bonus time' to conduct additional investigations by an expeditious performance of the traffic-related investigation"). The motion judge found that the detectives arrived while "Nelson [was] standing at the driver's side of the vehicle." Nelson testified that, after stopping the vehicle, he explained to the driver that he had

stopped her for speeding and requested her license and registration; she produced a registration certificate but was unable to produce a license.  Nelson recalled that he had been speaking with the driver for "[a]pproximately a minute," and had yet to confirm her name and date of birth, see id. at 242 (tasks during routine traffic stop reasonably include "confirmation of the identity of the driver"), when Bombardier and Campbell arrived and spoke to the driver about the smell of marijuana. At that point Nelson returned to his cruiser to confirm McGovern's information.  Contrast id. at 247 (continued detention of defendant unreasonable where "the investigation of the civil traffic violations" justifying stop "was complete").

We also reject the defendant's argument that Bombardier's question to the driver about the smell of marijuana fell beyond the permissible scope of the stop.  That argument is foreclosed by this court's opinion in Commonwealth v. Cruz, 459 Mass. 459 (2011).  Cruz was decided following the enactment of G. L. c. 94C, §§ 32L-32N, which "changed the status of the possession of one ounce or less of marijuana from a criminal to a civil offense."  Id. at 464.  In Cruz, an officer who had conducted a valid traffic stop detected an odor of burnt marijuana as he approached the driver's side window; we held that the officer's "asking the driver whether he had been smoking marijuana" did not constitute an impermissible expansion of the scope of the

stop, "because the officers could potentially have issued the driver a civil citation pursuant to G. L. c. 40, § 21D."  Id. at 466.[16]  The stop at issue here took place in January, 2013 -- after the Cruz decision, while possession of marijuana remained a civil offense.[17]  As in Cruz, then, Bombardier did not exceed the scope of the stop when inquiring about the smell of marijuana emanating from the vehicle, given his authority to issue a civil citation.  "Once in the process of making a valid stop for a traffic violation," as here, "officers are not required to 'ignore what [they] see[], smell[] or hear[].'"  Cruz, 459 Mass. at 466, quoting Bartlett, 41 Mass. App. Ct. at 471.

3.  Consent.  The defendant argues that the evidence should be suppressed because the driver did not voluntarily consent to the search of the vehicle.  See Commonwealth v. Podgurski, 386 Mass. 385, 390-392 (1982), cert. denied, 459 U.S. 1222 (1983) (passenger may object to validity of vehicle search).  A warrantless search such as this is presumptively unreasonable under both the Fourth Amendment and art. 14 unless one of the

---

[16] See G. L. c. 94C, § 32N (directing police departments to "enforce [G. L. c. 94C, § 32L,] in a manner consistent with the non-criminal disposition provisions of [G. L. c. 40, § 21D]").

[17] Effective December, 2016, the Regulation and Taxation of Marijuana Act states, in pertinent part, that adults shall not be penalized or sanctioned "under the laws of the commonwealth in any manner" for possessing an ounce or less of marijuana. See G. L. c. 94H, § 7 (a) (1).

"few specifically established and well-delineated exceptions" to the warrant requirement apply. Commonwealth v. Johnson, 461 Mass. 44, 48 (2011), quoting Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). A search authorized by consent is one such exception. See Commonwealth v. Buswell, 468 Mass. 92, 105 (2014). As with all warrantless searches, the Commonwealth bears the burden of proof that consent was "freely and voluntarily given," Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995), quoting Bumper v. North Carolina, 391 U.S. 543, 548-549 (1968), meaning it was "unfettered by coercion, express or implied." Commonwealth v. Harmond, 376 Mass. 557, 561 (1978) quoting Commonwealth v. Walker, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). "Voluntariness of consent 'is a question of fact to be determined in the circumstances of each case.'" Id., quoting Commonwealth v. Aguilar, 370 Mass. 490, 496 (1976). As a question of fact, "it should not be reversed absent clear error by the judge." Commonwealth v. Gray, 465 Mass. 330, 343, cert. denied, 134 S. Ct. 628 (2013), citing Commonwealth v. Carr, 458 Mass. 295, 303 (2010).

We discern no error here. The motion judge, who "was in the best position to assess the weight and credibility of the testimony given at the [suppression] hearing," Carr, supra, concluded that the driver freely and voluntarily consented to the search of the vehicle. This was based in part on the

judge's finding that when Bombardier "asked [the driver] if she had any marijuana in the car.  She told him she did not think so and said that he could check."  The fact that the driver affirmatively offered the search naturally supports the judge's conclusion that her consent was voluntary.  See Commonwealth v. Sanna, 424 Mass. 92, 97-99 (1997) (concluding that "the police had properly entered the defendant's home on the consent given by the father").  Further, the record lacks any evidence to suggest that the officers' conduct during the vehicle stop was at all coercive.  See Commonwealth v. Cantalupo, 380 Mass. 173, 177-178 (1980).  Contrast Carr, 458 Mass. at 302-303 (consent not voluntary where armed officers "completely blocked the only exit" from premises, officer who sought permission to search "signaled his distrust of the defendants," and request to search "sounded more like an order").  Finally, that the police did not inform the driver of her right to refuse does not, as the defendant argues, invalidate her consent.  "The fact that a person is not informed by the police that he has a right to refuse to consent to an entry or search is a factor to be considered on the issue of voluntariness, but is not determinative of the issue."  Sanna, 424 Mass. at 97 n.10.  Given the absence of record evidence to the contrary, we conclude that the motion judge did not err in finding that the

driver freely and voluntarily consented to the search of the vehicle.

Conclusion.  For the foregoing reasons, we affirm the denial of the defendant's motion to suppress the evidence against him.  We also affirm the judgment of conviction of unlawful possession of a controlled substance.

So ordered.

BUDD, J. (concurring). I join the opinion of the court because I agree that it is unworkable to strike down the authorization rule articulated in Commonwealth v. Santana, 420 Mass. 205 (1995).  However, I write separately because, although -- as the court points out -- the driver here was not stopped for "driving while black," it is important to highlight how pretextual stops disproportionately affect people of color, and to explore what can be done to mitigate the harm caused by this practice.

Years of data bear out what many have long known from experience:  police stop drivers of color disproportionately more often than Caucasian drivers for insignificant violations (or provide no reason at all).  In 2017, the Stanford Open Policing Project found that police stopped African-American drivers more than Caucasian drivers, controlling for population makeup, both nationally and in Massachusetts.[1]  Stanford Open Policing, Stop Rates, 2017, https://openpolicing.stanford.edu /findings/ [https://perma.cc/F6HT-87WE].  See United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Special Report, Police Behavior During

---

[1] I note that although most of the data focuses on people of color, other marginalized communities, i.e., groups of people who have historically experienced some form of oppression or exclusion, are also the target of heightened police attention. Transgendered people, for example, have reported facing disproportionate harm by encounters with law enforcement. Activists Say Police Abuse of Transgender People Persists Despite Reforms, New York Times, Sept. 6, 2015.

Traffic and Street Stops, 2011, at 3 (rev. October 27, 2016),

https://www.bjs.gov/content/pub/pdf/pbtss11.pdf

[https://perma.cc/2ML3-UWY9].

In effectuating traffic stops, most officers act in good faith. Even where they do, to a Caucasian driver a traffic stop may be annoying or embarrassing, but for a driver of color, such a stop can be humiliating and painful.[2] Commonwealth v. Feyenord, 445 Mass. 72, 88 (2005), cert. denied, 546 U.S. 1187 (2006) (Greaney, J., concurring). Further, recent tragic events have shown that the fear people of color have of being stopped by police is justified: African-Americans have been killed during routine traffic stops.[3]

---

[2] In Commonwealth v. Warren, 475 Mass. 530, 540 (2016), when we discussed the related problem of racial profiling in Terry-type stops, we noted "the recurring indignity of being racially profiled."

[3] The following are a few recent examples that have gained national attention. A police officer in Minnesota stopped Philando Castile for a broken taillight. During the encounter, the officer shot him four times, killing him in front of his fiancée and four year old daughter. Woman Streams Aftermath of Fatal Officer-Involved Shooting, Cable News Network, July 8, 2016, http://www.cnn.com/2016/07/07/us/falcon-heights-shooting-minnesota/index.html [https://perma.cc/4P5A-YY28]. In Ohio, the police stopped Samuel DuBose for failing to display a front license plate, and fatally shot him during the stop. The Shooting of Samuel DuBose, New York Times, July 29, 2015. The South Carolina police stopped Walter Scott for a broken taillight, and shot him to death as he fled. Carbado, From Stopping Black People to Killing Black People: the Fourth Amendment Pathways to Police Violence, 105 Cal. L. Rev. 125, 149 (2017). In Texas, a police officer stopped Sandra Bland for failing to signal a lane change. Id. at 150. She was found dead in jail three days later. Id.

It goes without saying that this is not a new phenomenon. Almost twenty years ago, then-Associate Justice Ireland noted statistics from multiple jurisdictions showing that African-American and sometimes Hispanic drivers were stopped more often than Caucasian drivers, even though Caucasian drivers were the majority group. Commonwealth v. Gonsalves, 429 Mass. 658, 670 (1999) (Ireland, J., concurring).

The reasons for pretextual stops of people of color stem from explicit bias (i.e., racial profiling), unconscious bias,[4] or a combination of both. See Carbado, From Stopping Black

---

Massachusetts is not immune from traffic stop violence. Wakeelah Cocroft, an African-American woman, was a passenger in a vehicle that the police stopped for speeding in Worcester. Cocroft v. Smith, 95 F. Supp. 3d 119, 123 (D. Mass. 2015). During the stop, an officer "forcefully threw Cocroft to the ground and scraped her face against the cement." Id. In a subsequent civil suit, a jury found that the officer had unlawfully seized Cocroft. Id. at 122.

It is also important to note that these examples are not meant to diminish the fact that police officers are at risk during traffic stops as well. Auburn police officer Ronald Tarentino, for example, was shot to death during a traffic stop. Obituary for Fallen Police Officer Ronald Tarentino, Jr., Boston Herald, May 24, 2016, http://www.bostonherald.com/news/local_coverage/herald_bulldog/2016/05/obituary_for_fallen_police_officer_ronald_tarentino_jr [https://perma.cc/8GNT-KQRU].

[4] Unconscious or implicit bias is a discriminatory belief or association likely unknown to its holder. Multiple studies confirm the existence of implicit bias, and that implicit bias predicts real-world behavior. See Kang & Banaji, Fair Measures: A Behavioral Realist Revision of "Affirmative Action," 94 Cal. L. Rev. 1063, 1071-1073 (2006). That is, even people who do not believe themselves to harbor implicit bias may in fact act in ways that disfavor people of color.

People to Killing Black People:  The Fourth Amendment Pathways to Police Violence, 105 Cal. L. Rev. 125, 129-130 (2017); Harris, The Stories, the Statistics, and the Law:  Why "Driving While Black" Matters, 84 Minn. L. Rev. 265, 291-292 (1999); Ramirez, Hoopes, & Quinlan, Defining Racial Profiling in a Post-September 11 World, 40 Am. Crim. L. Rev. 1195, 1197-1198 (2003).  See also Greenwald & Krieger, Implicit Bias:  Scientific Foundations, 94 Cal. L. Rev. 945, 951 (2006); Lawrence, The Id, the Ego, and Equal Protection:  Reckoning with Unconscious Racism, 39 Stan. L. Rev. 317, 343 (1987).  Regardless of the cause, it is a persistent, pervasive problem that must be addressed.

The solution, however, is not clear cut.  For the reasons outlined by the court, the answer is not to overrule the authorization rule articulated in Santana, 420 Mass. at 208-209.  As the court has explained, inquiring into subjective police intent for traffic stops would lead to several practical difficulties, not least among them the question of how precisely to determine intent.  Ante at    .

In Commonwealth v. Lora, 451 Mass. 425 (2008), the court reiterated that although "law enforcement officers enjoy considerable discretion in exercising some selectivity for purposes consistent with the public interest," that "selectivity" cannot be based on "an unjustifiable standard such

as race, religion or other arbitrary classification"[5] (quotations and citations omitted). Id. at 436-437. The court concluded that to rebut the presumption that a stop was not undertaken as a result of an arbitrary classification, a defendant must present "credible evidence establishing a reasonable inference of impermissible discrimination." Id. at 443. The court further held that

> "[a]t a minimum, that evidence must establish that the racial composition of motorists stopped for motor vehicle violations varied significantly from the racial composition of the population of motorists making use of the relevant roadways, and who therefore could have encountered the officer or officers whose actions have been called into question."

Id. at 442.

Thus, the court attempted to provide a means of combatting pretextual stops based on race with statistics. We noted that a similar approach had been somewhat successful in New Jersey. Id. at 440-441, citing State v. Soto, 324 N.J. Super. 66 (1996). As it happened, traffic stop statistics also were being collected in the Commonwealth. Before Lora was decided, the Legislature had passed An Act providing for the collection of data relative to traffic stops (act), St. 2000, c. 228. Pursuant to the act, Northeastern University analyzed a year's worth of data collected on racial and gender profiling, and

---

[5] As the court points out, the defendant did not bring a claim under the equal protection provisions of the Massachusetts Constitution, another fatal blow to mounting a challenge to pretextual stops. Ante at      .

issued a report in 2004. Lora, 451 Mass. at 448. Despite the Legislature's focus on data collection in this act, the court acknowledged that the defendant's evidentiary burden was "daunting." Id. at 445.

In a concurring opinion, then-Justice Ireland pointed out some of the difficulties involved in collecting the necessary data, even with the act in place. Id. at 449 (Ireland, J., concurring). For example, although the act required law enforcement agencies that had racially profiled to continue to gather statistics, it did not contain provisions requiring those agencies to report the data to anyone or to analyze the data, severely undercutting any use that data might have had. Id. (Ireland, J., concurring). Moreover, almost one-half of the targeted agencies failed to follow the reporting guidelines of the act, for example by failing to track certain factors or failing to report at all. Id. (Ireland, J., concurring).

Justice Ireland's concerns were prescient: the act required governmental data collection for only a limited amount of time, and the Legislature has not renewed the necessary funding. See St. 2000, c. 228, § 8 (assigning financial responsibility to State agencies); id. at § 10 (requiring data to be transmitted for analysis after one year). Statistics on traffic stops, thus, are now even more difficult to come by. We are not aware of any traffic stop cases in which a defendant has

been able to gather and use statistics to prove that the stop violated equal protection principles; it appears that Lora has not provided the opportunity for defendants that we had hoped it would.

Concerns about bias in pretextual traffic stops are well founded, as are concerns about the practical ability of defendants to show racial bias by way of statistics as suggested by Lora.  Because this is not a "driving while black" equal protection case, the issue is not squarely before us.  However, it is worth noting that it has been seventeen years since the Legislature required State agencies to collect data on racial profiling.  We are not aware of the data ever being used to mount a challenge under Lora, and it is now woefully outdated. The time has come for the Legislature to address the problem once more.  Publicly available data would not only assist litigants, but would also inform the public about this ongoing problem.

In the meantime, our recent holding in Commonwealth v. Cordero, 477 Mass. 237 (2017), has added to our jurisprudence. There we held that a traffic stop may go no further than investigating the alleged traffic violation unless that investigation leads to information to support reasonable suspicion of a crime.  Id. at 247.  See Commonwealth v. Amado, 474 Mass. 147, 151 (2016); Gonsalves, 429 Mass. at 663;

<u>Commonwealth</u> v. <u>Torres</u>, 424 Mass. 153, 158-159 (1997). These cases are by no means a cure for racial profiling in traffic stops, but they may provide a means to lessen their impact on drivers and diminish the incentive to conduct pretextual stops.