SUPERIOR COURT 
 
 COMMONWEALTH v. STEVEN COACHMAN

 
 Docket:
 2384CR00024
 
 
 Dates:
 May 6, 2024
 
 
 Present:
 William F. Bloomer Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS (Paper No. 9)
 
 

             The defendant, Steven Coachman ("Coachman"), moves to suppress a firearm seized by police officers from his vehicle on October 7, 2022, as well as his statements to an officer after his arrest. Following a hearing, and for the reasons set forth below, Coachman ' s motion to
suppress is DENIED.
FINDINGS OF FACT
            On April 25, 2024, the court heard testimony from Boston Police Department ("BPD") Officer Suni Muhammad ("Muhammad") and Massachusetts State Police ("MSP") Trooper Stephen Hazelton ("Hazelton"). Coachman did not testify. The court makes the following factual findings based on the credible evidence produced at the hearing and the reasonable inferences drawn from that evidence. In making these findings, the court finds the testimony of Muhammad and Hazelton truthful and accurate on the relevant and material points set forth below.
            At the time of the firearm seizure, Muhammad and Hazelton were members of the Youth Violence Strike Force ("YVSF"). Officers assigned to the YVSF patrol high-crime areas within the City of Boston and respond to incidents involving firearm violence. Muhammad has been a
 
                                                            -1-
 
BPD officer for eight years and assigned to the YVSF since 2019. Hazelton has been an MSP trooper for approximately ten years. At the time of the incident, Hazelton had been assigned to the YVSF for approximately four and one-half years. He is currently assigned to a Gang Unit within the MSP. Hazelton has received training regarding individuals suspected of operating a motor vehicle under the influence of alcohol or drugs. Both officers have training and experience in investigating offenses involving firearms.
            On October 7, 2022, Muhammad, Hazelton, and MSP Trooper Ralph Doug ("Doug") were on patrol in an unmarked black SUV in the Grove Hall area of Boston. The officers were dressed in plain clothes but wore tactical vests with their respective department's names displayed on their vests. Doug drove, Hazelton was the front seat passenger, and Muhammad was in the rear passenger compartment of the SUV. Muhammed and Hazelton were outfitted with body cameras. See Exhibit ("Ex.") 2 (body camera recordings).
            At approximately 7:50PM, the three officers were stopped on Intervale Street at the intersection of Fernboro Street. This area of Boston is thickly settled and there is a park for children that runs alongside both Intervale and Fernboro Streets. See Ex. 3 (map of area). Although Fernboro Street allows for traffic in both directions, only one car at a time can travel down the street if vehicles are parked on both sides of the road.
            While stopped at the intersection, the officers heard a car revving its engine and observed a black Nissan Maxima driving at a high rate of speed on Fernboro Street. Hazelton estimated the Maxima to be traveling at more than 40 miles per hour. The car screeched to a stop at the intersection, nearly striking individuals standing near a Jeep parked curbside. The Maxima came within inches of these individuals, causing one of them to lean into or enter the vehicle to avoid being hit.
 
                                                            -2-
 
            The officers immediately exited their cruiser, which remained stopped just past the stop sign at the intersection. The sole occupant and driver of the Maxima, later identified as Coachman, began to beep the Maxima's horn at the officers " excessively ." The officers approached the driver ' s side of the car and identified themselves. Officers informed Coachman of their observations of his driving and asked him if he was aware that he almost struck some pedestrians. Hazelton noted that Coachman's eyes were red and glassy and his speech was slurred. Hazelton asked Coachman to step from the vehicle. At that time, the officers intended to charge Coachman with operating a motor vehicle in a reckless or negligent manner such that the lives and safety of the public were endangered.
            Upon stepping from the Maxima, Coachman was unsteady on his feet and his appearance was disheveled; his pants were undone and his belt was off. It was immediately apparent to officers that Coachman was operating the Maxima in a diminished capacity due to alcohol intoxication.
            Hazelton escorted the defendant to a sidewalk a short distance from the Maxima with the intent of asking Coachman to perform field sobriety tests. Coachman leaned against a chain-link fence for balance as he spoke to Hazelton. As Hazelton interacted with the defendant, he could smell an order of an alcoholic beverage emanating from Coachman. Hazelton asked the defendant if he had consumed any alcohol. The defendant admitted he did, stating that he was mourning the loss of a family member. Before any field sobriety tests could be administered, however, an unruly crowd of approximately six males began to gather and confront the officers in an aggressive manner. Doug dealt with members of this crowd at the driver's side of the Maxima.
 
                                                            -3-
 
            Meanwhile, Muhammed commenced an inventory search of the Maxima. Sec Ex. 1 (BPD Inventory Policy). He observed a nylon-type blue bag on the passenger-side floor. Muhammed squeezed or "crunched" the bag and felt a hard object inside. Upon opening the bag and shining his flashlight into it, Muhammed observed the butt end of a handgun. See Ex. 2 (Muhammed body camera footage). He then turned to Hazelton making an "X" formation with his arms, signaling to Hazelton that a firearm had been located and to handcuff Coachman. Muhammad then confirmed the handgun was not a replica.
            Hazelton, who remained with Coachman on the sidewalk, was unable to administer any field sobriety tests because members of the crowd, including the defendant' s brother, wanted to take possession of the Maxima and advocated loudly for Coachman's release. Additionally, after the discovery of the firearm, Coachman was handcuffed and unable to perform any roadside tests. In light of his observations of the defendant, as well as the defendant's driving, Hazelton believed Coachman to have operated a motor vehicle under the influence of alcohol. Given the evolving situation with the crowd, Hazelton did not advise the defendant of his Miranda rights immediately. Hazelton shouted to Muhammad to lock the vehicle given the crowd's advance.
            Coachman was cooperative, however, shouting to his brother and the crowd to " chill out" and let the police do their job.  After learning of the discovery of the firearm, Hazelton demanded Coachman produce a license to carry. Coachman responded he had been "shot three times" and that he was 54 years old and scared for his life. Hazelton asked Coachman for the Maxima' s key, patted him down, and asked Coachman to sit down so he could assist his partners in dealing with the crowd. Coachman was placed in a marked BPD cruiser.
 
                                                            -4-
 
            Officers towed the Maxima and transported Coachman to the police station, where he was advised of his Miranda rights. Police also advised Coachman of his statutory right to consent to take a breathalyzer test. Coachman declined to submit to the breath test.
            Hazelton and Muhammad were both aware of "Melanie's Law" at the time of the defendant's arrest. Hazelton understood the law to require officers to place a twelve-hour hold on a vehicle whenever the driver of that vehicle is placed in custody for operating a motor vehicle while under the influence of alcohol. The purpose of the law, as Hazelton and Muhammad understood it, is to prevent such an individual , if released on bail, from re-entering and driving the vehicle while still under the influence of alcohol, thereby placing the public at risk.
CONCLUSIONS  OF LAW
            1. The initial stop of the Coachman in the Maxima was lawful. Commonwealth v. Cordero, 477 Mass. 237, 242(2017). The fact that a traffic law has been violated is, generally speaking, a legally sufficient basis to justify stopping vehicle. See Commonwealth v. Buckley, 478 Mass. 861, 869 (2018); Commonwealth v. Cruz, 459 Mass. 459, 465 (2011). Here, officers reasonable believed the Maxima was traveling at an excessive speed on a narrow street in a densely populated area, and even more significantly, they had probable cause to believe Coachman was committing the criminal misdemeanor offense of operating a vehicle recklessly or negligently so as to endanger the lives and safety of the public, including when he nearly struck the individuals standing outside the Jeep with his vehicle. See G.L. c. 90, § 24(2)(a). As the situation evolved, officers had probable cause to believe Coachman was operating a motor vehicle while under the influence of alcohol.
 
                                                            -5-
 
            2. There are three bases upon which an exit order may be justified: (I) an objectively reasonable concern for the safety of the officer or other persons; (2) reasonable suspicion that the passenger is engaged in criminal activity; or (3) pragmatic reasons. See Commonwealth v. Cruz, 459 Mass. 459, 466-467 (2011). Here, the officers had probable cause, more than reasonable suspicion, to believe that Coachman was engaged in the criminal activity of operating a motor vehicle in a negligent manner endangering the lives and safety of the public. further, the police had reasonable suspicion, based on Coachman's manner of operating the motor vehicle and the fact that his eyes were red and glassy and his speech slurred, that Coachman was operating the motor vehicle under the influence of alcohol. Additionally,  because the police had probable cause to arrest Coachman for negligent operation, the exit order was also based on the pragmatic purpose of placing the defendant under arrest. See Commonwealth v. Frazier, 2013 Mass. App. Unpub. LEXIS 49 at *2 (2013) (Rule 1:28 opinion) (observation of defendant operating motor vehicle negligently and odor of alcohol justified exit order); Commonwealth v. Rivera, 2012 Mass. App. Unpub. LEXIS 206 at *1 (2012) (Rule 1:28 opinion) (exit order lawful based on probable cause to arrest). The exit order was, therefore, lawful.
            3. The impoundment of the Maxima and the inventory search conducted at the scene were proper. "To justify this type of warrantless search [of a motor vehicle], the Commonwealth bears the burden of establishing, first, that the impoundment was reasonable under the circumstances, and, second, that police conducted the inventory search in accordance with established written procedures." Commonwealth v. Davis, 481 Mass. 210, 218 (2019) (citation omitted); Commonwealth v. Ehiabhi, 478 Mass. 154, 164-165 (2017) ("The law fulness of an inventory search turns on the threshold propriety of the vehicle's impoundment, and the Commonwealth bears the burden of proving the constitutionality of both.").
 
                                                            -6-
 
            Impoundment of a vehicle on a public way is justified by at least three distinct needs: protection of the owner's property from vandalism or theft while the vehicle remains in police custody, see Commonwealth v. Ellerbe, 430 Mass. 769, 775 (2000); where a vehicle, if left unattended, poses a public safety risk, see Commonwealth v. Brinson , 440 Mass. 609, 612 (2003); and protection of police and the public from potentially dangerous items in the vehicle,  see United States v. Coccia, 446 F.3d 233, 240 (1st Cir. 2006), cert. denied, 549 U.S. 1149
(2007).
            When an individual is arrested for operating a motor vehicle while under the influence of alcohol and refuses to take a breath test, G.L. c. 122, § 9(1)(iii), a subsection of " Melanie ' s Law," requires police officers to " impound the vehicle being driven by the operator and arrange for the vehicle to be im pound ed for a period of 12 hours after the operator's refusal, with the costs for the towing, storage and maintenance of the vehicle to be borne by the operator."
            The police acted law fully in impounding the Maxima following the defendant's arrest for operating under the influence of alcohol. It would have defeated the purpose of that provision  of  the Melanie's Law - to protect the public from an intoxicated person reentering their vehicle within twelve hours of refusing to take a breath test and driving again on the public roads - to release the car to a family member. Here, Coachman refused the breath test, and his bail status had not been determined. The statute states that police "shall" impound a motor vehicle in the circumstances of this case. They had no discretion to do otherwise.
            Police also lawfully conducted an inventory search of the Maxima at the scene. An inventory search is "a well-established exception to the warrant requirement." Ehiabhi, 478 Mass. at 164 (citations omitted). An inventory search is conducted for the purposes of "safeguarding the car or its contents, protecting the police against unfounded charges of
 
                                                            -7-
 
misappropriation, protecting the public against the possibility that the car might contain weapons or other dangerous instrumentalities that might fall into the hands of vandals, or a combination of such reasons." Commonwealth v. Muckle, 61 Mass. App. Ct. 678, 682-683 (2004). Article 14 requires that inventory searches of automobiles be conducted pursuant to standard police procedures, and that those procedures must be in writing.  Commonwealth  v. Alvarado, 420  Mass. 542, 553 (1995). "Unlike other types of searches, an inventory search is administrative, and the decision to conduct an inventory search must not be for investigatory purposes; the decision must be objectively reasonable, and the search must be conducted according to standard written procedures." Commonwealth v. Davis, 481 Mass. 210,219 (2019) (citation omitted).
            Once Coachman was arrested and his vehicle was impounded, Muhammad's inventory search of the Maxima was objectively reasonable in the circumstances of this case and authorized by BPD's written "Motor Vehicle Inventory Search Policy ." See Ex. 1. That policy states in part that "all motor vehicles secured by the Boston Police Department shall be inventoried."[1] Id. at *2, ¶ 7. The policy further directs, "[w]hen circumstances and conditions permit, an Inventory Search will be conducted at the scene PRIOR to the towing of the vehicle." Id. at *l, ¶ 3 ( emphasis in original). The policy also states, "[t]he interior of all secured vehicles will be searched to discover valuable property. In conducting such search, officers will examine any place in the passenger compartment that could contain valuable property. This will include closed, but unlocked, containers in the passenger compartment."   Id. at *2, ¶ 8 (emphasis in original).
            Muhammad's search of the closed but unlocked blue nylon bag found on the front seat passenger floor was permitted, and mandated, by BPD's written inventory policy and
 
--------------------------------------------
 
[1] The inventory policy cites Boston Police Department Rule I 03, section 32,  and  defines "securing"  to  include "towing." Sec Ex. I at *2 , ¶¶ 5-6 .
 
                                                            -8-
 
constitutionally permissible. See, e.g., Commonwealth v. Allen, 76 Mass. App. Ct. 21, 24-25 (2009) (officer properly searched closed but unlocked box in closed bookbag found inside car's trunk when written inventory policy stated all unlocked containers should be opened and contents inventoried); Commonwealth v. Figueroa, 412 Mass. 745, 749 (1992) (inventory search properly encompasses all open areas, including area under seats, unlocked glove compartment, and other places where property is likely to be located, if described in written policy).
            4. Coachman's statements in response to Hazelton' s demand to produce a license to carry firearms are not subject to suppression.2 The exact issue of whether police are required to administer Miranda warnings before demanding a suspect in custody produce a license to carry a firearm was directly addressed by the  SJC  in Commonwealth  v. Haskell, 438, Mass. 790, 796- 797 (2003), and more recently by the Appeals Court in an unpublished decision, Commonwealth v. Dyson, 2023 Mass. App. Unpub. LEXIS 386 (2023). Despite having seemingly conflicting results, Haskell (finding Miranda warnings were required related to license to carry firearm inquiry) and Dyson (finding Miranda warnings were not required related to demand to produce license to carry), both cases clearly set forth when Miranda warnings must be provided in the context of determining if a suspect has a license to carry.
            General Laws c. 140, § l 29C, requires that a person found in possession of a firearm outside of his residence or property, "shall on demand of a police officer... exhibit his license to carry firearms... " "The statute makes no mention of Miranda warnings, and, even if it did, the warnings may not be waived by statute ... This is not to say that the police must administer Miranda warnings before demanding, pursuant to § I 29C, that a suspect in custody produce a
 
--------------------------------------------
 
[2] Coachman 's motion to suppress does not affirmatively seek suppression of his statements . The court nevertheless addresses the issue for cause shown, name ly, Coachman's affidavit in support of the motion states that he neither consented to police questioning nor waived his Miranda rights.
 
                                                            -9-
 
license to carry firearms." Haskell, 438 Mass. at 796. Although the Miranda warnings and the related privilege against self-incrimination protect a suspect' s testimonial communications, " it does not permit a suspect to refuse to produce real or physical evidence (such as a license) when lawfully ordered to do so." Id. "It would serve no purpose to advise a suspect that he has a right to remain silent when police are only demanding the production of physical evidence that the suspect may not withhold. The police, therefore, need not administer Miranda warnings before demanding that a suspect in custody produce one of the documents listed in § I 29C." Id.
            In Haskell, instead of ordering the production of a license to carry, the officer asked the defendant in custody whether he had a license to carry firearms. Recognizing that "as subtle as this distinction may seem," the Court determined this was an invitation to relate a factual assertion and "was therefore a request for a testimonial communication that entitled the defendant to the Fifth Amendment's protections... " Id. Ultimately, the SJC clarified that it is a matter of form where a question as to whether a suspect in custody had a license to carry requires Miranda, but an order or demand to produce a license to carry does not. Id. See Dyson, 2023 Mass. App. Unpub. LEXIS 386 at *9-*10 (although defendant handcuffed and under arrest, demand to produce license to carry did not constitute custodial interrogation under Haskell).
            In the case at bar, Hazelton demanded that Coachman produce a license to carry a firearm upon the recovery of the gun from the Maxima. He did not ask Coachman a question.
Therefore, as this was a demand for the production of physical evidence, Miranda warnings were not required. The motion to suppress Coachman's spontaneous statements in response to the demand to produce a license to carry firearms must be denied.[3]
 
-----------------------------------
 
[3] Coachman further seeks suppression of all evidence against him based on the prosecution's failure during the evidentiary hearing to elicit testimony from the arresting officers identifying him as the person who allegedly committed the crimes charged. Believing it to be a matter of first impression, Coachman points to no authority directly supporting his contention. Compare Mass. R. Crim. P. 25 (motion for a required finding of not guilty at
 
                                                            -10-
 
ORDER
            For the reasons set forth above, the Defendant's Motion to Suppress (Paper No. 9) is DENIED.
 
--------------------------------------------
 
trial). Here, the body camera footage was admitted in evidence and viewed  by the court during and after the hearing. It depicts the defendant standing on the sidewalk and eventually being attested. See Ex. 2. In these limited circumstances, the court concludes that suppression of the evidence is not required despite the Commonwealth's inadvertence.