NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-1045                                        Appeals Court

COMMONWEALTH vs. ONAXIS BARRETO.

No. 17-P-1045.

Suffolk.     May 11, 2018. - October 29, 2018.

Present: Milkey, Hanlon, & Singh, JJ.

Controlled Substances. Practice, Criminal, Motion to suppress. Constitutional Law, Search and seizure, Investigatory stop, Reasonable suspicion. Search and Seizure, Motor vehicle, Reasonable suspicion. Evidence, Anonymous statement, Corroborative evidence.

Indictment found and returned in the Superior Court Department on August 28, 2014.

A pretrial motion to suppress evidence was heard by Kenneth W. Salinger, J., and a motion for reconsideration was considered by him.

An application for leave to prosecute an interlocutory appeal was allowed by Geraldine S. Hines, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

Eduardo Masferrer for the defendant.
Kathleen Celio, Assistant District Attorney, for the Commonwealth.

MILKEY, J.  In August, 2014, a grand jury indicted the defendant for trafficking in 200 grams or more of cocaine. G. L. c. 94C, § 32E (b) (4).  The charge was based on evidence found during a warrantless search of the defendant's motor vehicle.  Following an evidentiary hearing, a Superior Court judge denied the defendant's motion to suppress that evidence.[1] On the defendant's interlocutory appeal, we reverse.

Standard of review.  "When reviewing a decision on a motion to suppress, we accept the judge's findings of fact absent clear error, but make an independent determination whether the judge correctly applied constitutional principles to the facts as found."  Commonwealth v. Evans, 87 Mass. App. Ct. 687, 688 (2015).  The judge made careful, detailed findings, all of which are supported by the record and therefore are binding on us. Notably, the judge rejected some of the police witnesses' claims about what they were able to observe from a distance, and the specific factual claims that the judge did credit were qualified.  The factual recitation that follows is drawn from the judge's findings.[2]

---

[1] The defendant filed a motion to reconsider that ruling, which also was denied.

[2] In reciting an interchange between the judge and counsel at the motion hearing, we of necessity rely on the transcript of that hearing.

Background.  1.  The tip provided to police.  The Boston police focused on the defendant's vehicle because of a tip they had received from an undisclosed source.  Specifically, on or before June 9, 2014, the police received information that a green Volvo station wagon containing a "large" amount of drugs would be near a certain intersection in the Roxbury section of Boston.  No other information regarding the tip was provided at the evidentiary hearing.[3]  Thus, for example, there was no evidence that the tipster provided the license plate number of the vehicle, what time it would arrive, or any information whatsoever about the vehicle's occupants, if any.  Similarly, there was no evidence about who the tipster was, how he or she purportedly came into possession of the alleged information, how that information was passed along to police, or whether the police had any reason to trust it.

It was not happenstance that so little evidence was presented about the tip, and none about the tipster.  At the beginning of the evidentiary hearing, the prosecutor made it clear that she did not intend to go into such issues because she

---

[3] The record does not contain any recording of the tip, or other memorialization of what words the informant used to convey his or her thoughts.  Instead, one of the testifying officers simply stated that the police had "received information from a source that a green Volvo station wagon that had a large amount of narcotics was in [the] area of [three streets in Roxbury]."

did not want to risk identifying the informant.[4]  Thus, in an effort to head off any inquiry into the tip, the prosecutor expressly disavowed trying to establish the tip's reliability pursuant to applicable case law, and she made it clear that she would be "objecting to any sort of [cross-examination] questions regarding the . . . source of that information that the police had."  Defense counsel responded that he was content with this arrangement based on his understanding of how the informant's alleged information would be treated.  Specifically, he stated as follows:  "It's a statement for context only that's not being used because it doesn't satisfy [the standard set forth in Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969)].  For those purposes, I've agreed to not go into the -- who the source is, how is it that it came about, what were the exact details of the tip because we're [sic] not using it under Aguilar-Spinelli to suppor[t] the stop or search."  The judge responded by stating, "Okay.  Fair enough."  The prosecutor made no effort to disabuse defense counsel of his understanding.

2.  Police observations.  Upon receiving the tip, four police officers set up surveillance at the intersection

---

[4] At one point, the prosecutor -- when pressed by the judge on whether she would be "attempting in any way to rely upon information from th[e] confidential source" -- hedged slightly by stating her view that "stuff can be corroborated."

mentioned by the informant.  At about 5:15 P.M. on June 9, 2014, they saw a green Volvo station wagon turn at the intersection without the driver using his turn signal.  The vehicle then parked approximately fifty feet away.  Shortly thereafter, one of the officers observed the vehicle's operator, subsequently identified as the defendant, lean down toward his right side "as if he [were] reaching toward the floor of the passenger side with both hands."  According to the judge's findings, the officer could not see the defendant's hands or what the defendant might have been doing with them.  Observing from a distance, the officers saw a man approach the parked vehicle from an adjacent building and interact with the defendant at the driver's side window for approximately half a minute.  While the judge found that the police observed the unidentified man who had approached the defendant's vehicle lean toward it "in a manner consistent with that man placing his hands on the Volvo door or reaching inside the Volvo," he also found that the police did not observe the defendant and the unidentified man actually "reach their hands toward each other, bring their hands together, or exchange any object."  Furthermore, the judge found that the police did not see anything in the pedestrian's hands as he was walking away from the vehicle, nor did they see him put anything into his pocket, or move his arm in a manner suggesting that he had just put anything there.  Despite the

absence of any observation of an item being exchanged between the men, the judge found that their interaction was "consistent with the two men exchanging something."

After the man walked away, the defendant drove his vehicle to an adjacent street, where the police pulled his vehicle over. Although the defendant appeared nervous, he produced his driver's license and vehicle registration when requested to do so. At this point, there were at least four officers at the scene, and one of them ordered the defendant out of the vehicle. As the defendant was stepping out of the vehicle, the officer saw a roll of cash in a clear plastic bag on the inside of the driver's door. After further questioning of the defendant proved fruitless[5] and a patfrisk of him revealed nothing, the police initiated a thorough search of the vehicle, subsequently aided by a drug-sniffing dog. They eventually uncovered a metal box underneath the passenger seat, inside of which was a large amount of cocaine and additional cash.

The defendant moved to suppress all the evidence the police collected pursuant to the stop and search of his vehicle, including the cocaine, its packaging, the money (which totaled $11,050), the defendant's cellular telephones, and a magnet that

___

[5] The police questioned the defendant in English. Although the defendant supplied his license and registration, he told the police that he did not speak English and therefore did not understand their further inquiries.

police believed was used to access a "hide" inside the vehicle. The judge ruled in the Commonwealth's favor. In doing so, he did not rely on the informant's tip in any fashion. In fact, with regard to that tip, the judge found that "[t]he Commonwealth did not present any evidence to demonstrate the basis for the informant's knowledge, that the police had any reason to believe that the informant was truthful, or that the police had corroborated the source's information that the [defendant's vehicle] would contain illegal drugs." Instead, the judge concluded that the police had reasonable suspicion to stop the vehicle and to order the defendant out of it based on the brief interaction that the police had observed between the defendant and the unidentified man who had approached his vehicle. Then, according to the judge, once the police observed the wad of bills in the driver's door while the exit order was being executed, they gained probable cause that justified their subsequent search of the vehicle.

Discussion. 1. Introduction. The dispute before us is relatively narrow. It is uncontested that the police found the cocaine and other incriminating evidence during an investigatory search of the defendant's vehicle. It follows that this search was valid only if the Commonwealth at that point had probable cause to conduct the search. Commonwealth v. Eggleston, 453

Mass. 554, 557 (2009).[6]  Moreover, the Commonwealth acknowledges that its claim that it had probable cause depends on the police having observed the roll of bills in the door of the vehicle while they were executing the exit order.  Therefore, if the exit order was not valid, the Commonwealth's claim that it had probable cause to search the vehicle falls short.

While the police could have stopped the vehicle for the civil traffic violation they observed,[7] this would not have justified the exit order that led to the discovery of the roll of bills.[8]  Rather, in the particular circumstances of this case, the validity of the exit order -- and hence the Commonwealth's claim that it obtained probable cause once it found the wad of

---

[6] Because of the so-called "automobile exception," a warrant was not required so long as the police had probable cause.  See Commonwealth v. Eggleston, 453 Mass. at 557, quoting Commonwealth v. Cast, 407 Mass. 891, 901 (1990) ("[A] warrant is not required to search an automobile 'when police have probable cause to believe that a motor vehicle on a public way contains contraband or evidence of a crime, and exigent circumstances make obtaining a warrant impracticable'").

[7] The fact that the traffic violation was not the actual reason the police stopped the defendant's vehicle would not matter.  See Commonwealth v. Buckley, 478 Mass. 861, 872-873 (2018).  For purposes of our review, we have assumed that the length of time between the observed traffic violation and the stop was short enough that the initial stop could be justified on this basis.

[8] The defendant cooperated with the police after the stop, and the Commonwealth makes no claim that the exit order independently was justified for safety reasons.  See Commonwealth v. Gonsalves, 429 Mass. 658, 665 n.5, 666-668 (1999).

bills -- depends on the police having gained reasonable suspicion that the defendant was engaged in illegal drug activity. See Commonwealth v. Bostock, 450 Mass. 616, 621-622 (2008) (exit order justified when police have reasonable suspicion that operator engaged in criminal activity). The key question, then, is whether, by the time the police ordered the defendant out of his vehicle, they had "reasonable suspicion, based on specific, articulable facts and reasonable inferences therefrom, that an occupant of the . . . motor vehicle had committed, was committing, or was about to commit a crime." Commonwealth v. Anderson, 461 Mass. 616, 621, cert. denied, 568 U.S. 946 (2012), quoting Commonwealth v. Alvarado, 423 Mass. 266, 268 (1996). We turn to that question and begin by examining the grounds on which the judge relied.

2. Reasonable suspicion. a. Police observations. The motion judge found, without referring to the tip, that the police had reasonable suspicion to believe the defendant was selling illegal drugs based on the defendant's brief interaction with the unidentified pedestrian (after the defendant stopped his vehicle on a public street and reached toward the floor of the vehicle). We disagree.

As noted, the police did not observe any item being exchanged between the defendant and the person who approached and leaned toward his vehicle. As the Commonwealth highlights,

testimony of an observed hand-to-hand exchange in some circumstances can establish the requisite degree of suspicion that an illegal narcotics sale has occurred even where the police do not "actually see an object exchanged." Commonwealth v. Kennedy, 426 Mass. 703, 710 (1998).[9] However, in those narcotics sale cases in which reasonable suspicion has been found in the absence of police observing an item being exchanged, there were significantly more suspicious circumstances than those encountered here. For example, in Commonwealth v. Stewart, 469 Mass. 257, 261 (2014), the court found reasonable suspicion for police to stop the defendant where -- knowing that he previously had been arrested for drug dealing -- they observed that "three persons followed [him] down a narrow street often used by drug users, with [a] woman counting currency as she walked, and then all four huddled briefly together in a doorway, before they dispersed." See Commonwealth v. Gomes, 453 Mass. 506, 511-512 (2009); Commonwealth v. Moses, 408 Mass. 136, 140 (1990).[10]

---

[9] Kennedy involved probable cause. Ipso facto, there is no per se rule requiring that police see an object exchanged in cases where, as here, the less rigorous standard of reasonable suspicion applies.

[10] In Commonwealth v. Gomes, the court held that the police officer had reasonable suspicion to stop the defendant in a high crime area at around 4 A.M., where the defendant was known to previously have been arrested on drug charges and was observed "displaying items in his hand[, which the officers could not

Here, as a police witness acknowledged, neither the defendant nor the putative buyer was known to the police.[11] Furthermore, the judge found that the police had no reason, based on past experience, to expect a drug transaction to occur in this particular area, which was made up of "relatively quiet residential streets."[12]  All the police observed was an unknown

---

see,] and then appearing to swallow those items as the [police] approached."  453 Mass. at 511.  In Commonwealth v. Moses, the court held that the police officer "had reason to suspect that a drug transaction was taking place" where he saw four individuals who were "standing near an automobile parked next to the sidewalk with its motor running [and] appeared to be interacting in some way with three . . . men who sat in the automobile[, and then, o]n making eye contact with [the officer,] all four [men on the sidewalk] quickly dispersed in two different directions[, and] [o]ne of the occupants of the automobile, on making eye contact with [the officer], immediately ducked under the dashboard, completely out of [the officer's]'s sight."  408 Mass. at 140.

[11] In its appellate brief, the Commonwealth repeatedly refers to the person who approached the vehicle as "Hispanic," even though his ethnicity has no relevance here.  We point this out only to alert the parties to the issue of implicit bias, from which no one is immune.  See Commonwealth v. Buckley, 478 Mass. at 878 n.4 (Budd, J., concurring) (discussing implicit bias).  We acknowledge that in their testimony, the witnesses described the pedestrian they had observed as Hispanic, and that the Commonwealth's appellate counsel apparently borrowed such references in their brief.  It is not difficult, however, to avoid unnecessary references that may implicate such bias whether it be present or not.  The motion judge did so in this case.  Relying on the same testimony as appellate counsel, the judge referred to the unknown parties by their roles (the pedestrian and the driver) and thereby focused his analysis on the relevant facts, the conduct of the individuals.

[12] Our dissenting colleague highlights that the judge credited the testimony of a police witness that over a ten-year period, "he ha[d] made numerous arrests for possession or

driver stop his vehicle in a residential neighborhood, lean down toward the passenger-side floor, and subsequently have a brief interaction with an unknown pedestrian during which the pedestrian leaned toward the vehicle (as if to place his hands on or in it).  As far as it goes, the judge's finding that what the police saw was "consistent with" a hand-to-hand exchange of illegal drugs is unassailable.  However, the defendant's observed actions would also be "consistent with" a broad range of other interactions.  These would include, as mere examples, the driver's saying a quick hello to an acquaintance he passed on the street, the driver's asking for directions after looking for a map, or the driver's stopping to drop off tickets to a sporting event or another item to a friend he had arranged to meet.  Even if there were sufficient evidence to establish reasonable suspicion that an exchange had taken place, there was not enough to establish that the exchange was of illegal drugs.

---

distribution of illegal narcotics in [that] general neighborhood."  Post at  .  In our view, such general background information added little, if anything, to the reasonable suspicion calculus.  See Commonwealth v. Johnson, 454 Mass. 159, 163 (2009) (urging that judges consider presence in a high crime area "with caution" given "that so-called high crime areas are inhabited and frequented by many law-abiding citizens who are entitled to be protected against being stopped and frisked just because of the neighborhood where they live, work, or visit"). "The term 'high crime area' is itself a general and conclusory term that should not be used to justify a stop or a frisk, or both, without requiring the articulation of specific facts demonstrating the reasonableness of the intrusion."  Ibid.

Put otherwise, if the looming presence of the unsubstantiated tip is truly disregarded, then the specific actions that the police observed -- even when seen through the eyes of experienced officers -- created at most a "hunch" that a drug transaction had just occurred.  As the Supreme Judicial Court has long held, a "mere 'hunch' is not enough" to establish reasonable suspicion.  Commonwealth v. Silva, 366 Mass. 402, 406 (1974).[13]

The Commonwealth seeks to justify the stop by having us add to the mix the undisclosed informant's tip about a green Volvo station wagon containing drugs.[14]  Although the judge himself placed no reliance on the tip, it is plain from one of the arresting officer's testimony that, unsurprisingly, such information played a major part in leading him "to believe that a possible drug transaction [had] occurred."  Because we can

---

[13] To be sure, as our dissenting colleague accurately points out, the police observed the defendant exhibit nervous behavior once they pulled over his vehicle.  However, the fact that someone became anxious after being stopped by at least four armed police officers has negligible force (particularly to the extent that the defendant did not speak English, a factual issue the judge did not resolve).  See Commonwealth v. Cruz, 459 Mass. 459, 468 (2011) ("It is common, and not necessarily indicative of criminality, to appear nervous during even a mundane encounter with police").

[14] The defendant has not argued that the statements the prosecutor made at the evidentiary hearing should estop the Commonwealth from trying to rely on the tip on appeal.  We assume arguendo that the Commonwealth's arguments based on the tip are properly before us.

affirm the denial of the motion to suppress on any ground fairly supported by the record, see Commonwealth v. Va Meng Joe, 425 Mass. 99, 102 (1997), we must evaluate whether considering the tip here makes a difference.

b.  The import of the tip.  The Supreme Judicial Court has made it clear that the Commonwealth cannot rely on an informant's tip unless the reliability of that tip has been demonstrated pursuant to the two-pronged Aguilar-Spinelli test (in which courts are to assess the extent to which the informant's veracity and basis of knowledge have been shown). See Commonwealth v. Upton, 394 Mass. 363, 375 (1985), citing Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969).  In continuing to adhere to the Aguilar-Spinelli test in the context of challenges brought pursuant to art. 14 of the Massachusetts Declaration of Rights, the court on multiple occasions has rejected calls that it adopt the less demanding "totality of the circumstances" test employed by the United States Supreme Court in challenges brought pursuant to the Fourth Amendment to the United States Constitution.  See Upton, 394 Mass. at 371-375 (rejecting the rule adopted in Illinois v. Gates, 462 U.S. 213 [1983]).  See also Commonwealth v. Lyons, 409 Mass. 16, 18 (1990) (declining to follow the rule stated in Alabama v. White, 496 U.S. 325, 328 [1990]); Commonwealth v. Mubdi, 456 Mass. 385, 395-396 (2010).

In its brief, the Commonwealth appears to maintain that where, as here, the tip is not the sole basis for the police action, the Aguilar-Spinelli test does not apply.  Rather, the Commonwealth seems to suggest, the information received from the informant can be considered as one factor among others that collectively tip the scales.  In this manner, the Commonwealth effectively advocates for a "totality of the circumstances" test that the Supreme Judicial Court has time and again rejected. Under existing case law, if the requisite level of suspicion depends on an informant's tip, that tip must satisfy Aguilar-Spinelli.

Here, nothing in the record establishes the informant's basis of knowledge or his or her veracity.  Indeed, although the Commonwealth refers to the information the undisclosed informant provided as an "anonymous tip," this actually overstates its force.  An anonymous tip -- such as one made by an unidentified caller to 911 -- typically includes some information that is helpful to assessing the caller's basis of knowledge or reliability.  See Commonwealth v. Depiero, 473 Mass. 450, 452-453 (2016) (anonymous 911 caller reported seeing drunk driving in Cambridge, with the vehicle "swerving all over the road").  The Commonwealth not only failed to make any evidentiary showing

with regard to these issues, but also expressly foreswore attempting to do so when the evidentiary hearing began.[15]

That said, the cases have long recognized that while the Commonwealth will need to demonstrate a tip's reliability based on "the informant's reliability and his or her basis of knowledge[, i]ndependent police corroboration may make up for deficiencies in one or both of these factors." Commonwealth v. Lyons, supra at 19. Thus, while the Aguilar-Spinelli test must be satisfied, there is more than one way of doing so. Moreover, in the context of reasonable suspicion, the demonstrated reliability of an informant's tip need not be as robust as what is needed to demonstrate probable cause. Lyons, supra. The question then is whether the observations the police made at the scene provided sufficient corroboration of the tip to establish its reliability for purposes of assessing reasonable suspicion.

At most, the police observations corroborated the unexceptional fact that at some undisclosed point in time, a green Volvo station wagon would be in the identified

---

[15] The fact that the record does not even memorialize what words the informant allegedly spoke itself impedes the Commonwealth's efforts to establish the indicia of reliability of information the police received. See Commonwealth v. Mubdi, 456 Mass. at 396 ("By failing to introduce the 911 call in evidence, the Commonwealth has made difficult what otherwise might have been a straightforward assessment of the caller's source of information").

neighborhood.[16]  As the Supreme Judicial Court recently observed, "Corroboration of purely innocent details that are observable by any bystander, such as the description of a vehicle and its location, provides only limited enhancement to the reasonable suspicion determination."  Commonwealth v. Pinto, 476 Mass. 361, 365 (2017).  To the extent the Commonwealth argues that the brief curbside interaction between the defendant and the unidentified pedestrian corroborated the tip that there were drugs inside of a green Volvo station wagon, we are unpersuaded.[17]  See Commonwealth v. Mubdi, 456 Mass. at 387, 398-399  (fact that a person was observed interacting with defendant and other occupant of defendant's vehicle and started to walk away from the vehicle after seeing approaching police officers held insufficient to corroborate informant's tip about a

---

[16] As noted, the informant provided no information about the vehicle's registration number or about the vehicle's occupants, if any.  It is far from clear that the informant's tip satisfied the separate particularity requirement.  Compare Commonwealth v. Lopes, 455 Mass. 147, 155, 157-158 (2009).  We do not resolve this issue, as the defendant has not raised it and we reverse on other grounds.

[17] In this regard, we note that it stands to reason that the extent to which police corroboration can fill in the gaps of demonstrating an informant's basis of knowledge and veracity will vary depending on how great those gaps are.  If the evidence regarding the tip itself comes close to meeting the Aguilar-Spinelli test on its own, then presumably a lesser amount of corroboration is needed.  Where, however, as here, there has been no direct showing of the informant's veracity and basis of knowledge, significant corroboration of that tip would be needed.

purportedly illegal sale of a firearm).  Compare Commonwealth v.

Dasilva, 66 Mass. App. Ct. 556, 560 (2006) (anonymous tip that

defendant illegally possessed a firearm was corroborated by

police observations that, "[a]fter looking directly at the

marked police cruiser, the defendant moved his right hand toward

his waistband, fled up the stairs of the building where he was

standing, and continued to flee even after [a police officer]

ordered him to stop").  Without a sufficient showing that the

informant's tip should be considered reliable, it cannot be

relied upon to demonstrate reasonable suspicion.[18]

Conclusion.  The judge was correct not to rely on the

informant's tip.  However, without such reliance, his ruling

that the police had reasonable suspicion to order the defendant

out of his vehicle cannot stand.  In turn, without a valid exit

order, the police cannot rely on their discovery of the wad of

---

[18] Contrary to the suggestion made by our dissenting colleague, there are no cases that hold that a tip as unsubstantiated and uncorroborated as the one before us can be relied upon -- in whole or in part -- to establish reasonable suspicion.  Indeed, it is difficult to find examples in the case law of where the Commonwealth put forward so little evidence to try to establish that a tip was reliable.  Of course, it is possible that the actual circumstances of the tip provided police solid grounds for believing that the defendant was engaged in illegal drug activities (with or without the subsequent observations that police made).  But in the context of a motion to suppress, the Commonwealth can rely only on what it puts in evidence.  While the Commonwealth has substantial leeway to protect its confidential sources, see Commonwealth v. D.M., 480 Mass. 1004, 1005 (2018), and cases cited, it must live with the litigation risks of doing so.

money in the driver's door, and the police therefore lacked probable cause to search his vehicle.  "Because the evidence in issue was traceable to . . . the illegal order[] that the defendant[] leave the car, it must in these circumstances be suppressed as the 'fruit of the poisonous tree.'"  Commonwealth v. Loughlin, 385 Mass. 60, 63 (1982).  The order denying the defendant's motion to suppress is reversed.

So ordered.

HANLON, J. (dissenting).  I agree with much of the majority's thoughtful decision.  Respectfully, however, I dissent on the crucial issue -- whether, at the time that the officers told the defendant to get out of the vehicle, they had a reasonable suspicion to believe that he had engaged in an illegal drug transaction.  The stop itself clearly was justified by the earlier traffic violation, a conclusion that the defendant does not really dispute.  The motion judge explicitly credited the officers' testimony "that [the defendant] made [a] turn [from Copeland Street through the intersection at Warren Street and onto Waverly Street] without using any turn signal."[1]

Background.  As the majority notes, the judge's findings were careful and thorough.  First, he found that, at the time of the encounter, the two lead officers, Fabiano and Gero, "were both experienced narcotics investigators."  They were assisted by officers from the District B-2 anti-crime unit.  "That afternoon they were looking to intercept and stop a green Volvo station wagon because an unidentified informant had told Fabiano that he could find such a vehicle in the area of Waverly and

_____

    [1] "[T]he authority to conduct a traffic stop where a traffic violation has occurred is not limited by '[t]he fact that the [police] may have believed that the [driver was] engaging in illegal drug activity.'"  Commonwealth v. Buckley, 478 Mass. 861, 866 (2018), quoting Commonwealth v. Santana, 420 Mass. 205, 208 (1995).

Copeland Streets in Boston and that the vehicle would contain a large amount of illegal narcotics."

When the officers stopped the defendant driving a green Volvo station wagon, they knew:  first, the defendant had stopped his vehicle on Waverly Street, in front of the first building on the left, "a residential building."  Second, "a second man immediately left the nearest building and walked to the driver's door of [the defendant's] vehicle[.  A]s the second man approached[, the defendant] leaned down to his right as if he were reaching toward the floor by the front passenger seat," using both hands.  Third, the defendant then sat back up and interacted for no more than thirty seconds with the second man, who stood immediately outside the driver's door of the defendant's vehicle.  During this interaction, the second man leaned toward the vehicle as if he were placing his hands on the vehicle's door or reaching into the vehicle; he "was moving one or both of his arms while he was standing next to the Volvo and facing [the defendant], in a manner consistent with the two men exchanging something."  Fourth, after approximately thirty seconds, the defendant drove away and the second man walked back into the building he had emerged from a moment earlier.  The motion judge found that, "[b]ased on their training and experience with hand-to-hand drug transactions, [the officers]

both suspected that the pedestrian had purchased some kind of illegal drugs from [the defendant]."

At the time that the officers ordered the defendant out of the vehicle, they had some additional information.  They had asked for his license and registration, noting that the defendant "seemed to be nervous . . . [and] that [he] seemed to be breathing heavily, was looking in his rear view and side view mirrors at the various police officers and vehicles that had pulled up behind him, and was not making eye contact" with either of the officers who were speaking with him.  Finally, while the judge declined to use the talismanic words "high crime area" and, in fact, specifically found that, as of this date, "the Boston police had no reason based on past experience to expect to see a drug transaction take place on Waverly Street or Copeland Street, which are both relatively quiet residential streets," he also "credit[ed] Of[ficer] Gero's testimony that over the years he ha[d] made numerous arrests for possession or distribution of illegal narcotics in this general neighborhood."[2]

Discussion. 1. Exit order.  The law is clear that a police officer may order a driver to get out of a vehicle when

---

[2] Specifically, Gero testified, "In that specific area of Warren and Copeland is a -- Warren Garden is across the street.  That area -- I've participated in numerous search warrants of the surrounding streets.  I've made firearm arrests, drug arrests, arrests for breaking and [entering,] warrant arrests in that general area of the past [ten] years."

he has a reasonable suspicion that the driver has committed a crime. See Commonwealth v. Bostock, 450 Mass. 616, 621-622 (2008). Therefore, as noted, the issue is whether the officer had reasonable suspicion when he ordered the defendant out of the vehicle.

"[R]easonable suspicion is a lower standard than probable cause." Commonwealth v. Smigliano, 427 Mass. 490, 492 (1998). See Commonwealth v. Hill, 49 Mass. App. Ct. 58, 63 (2000):

> "The specific facts on which the police based their stop of the defendant have been described as follows: '(1) a vehicle pulled up and an interaction occurred between someone in the vehicle and someone [in the parking lot], who apparently retrieved something before concluding the interaction with the vehicle's occupant; (2) [the interaction occurred] in a place known by the police officer[s] as a place of high incidence of drug traffic; and (3) [the interaction was] witnessed by an experienced officer, who had made numerous drug arrests [although not necessarily in the neighborhood] and considered the event as [suggesting] a drug sale.' Commonwealth v. Kennedy, 426 Mass. [703], 708 [1998]. Moreover, 'the quickness of the interaction between [the other party and the defendant] reasonably could be interpreted by the officer as suspicious conduct, similar to the suspicious conduct of the "furtive" transaction observed in [Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992)].' Commonwealth v. Kennedy, supra at 708-709. We are mindful that in Kennedy the seller had been arrested previously for narcotics sales and was the subject of complaints from people in the neighborhood, id. at 704; that in Santaliz, there was an obvious exchange of an object and money, supra at 240; and that in both Kennedy and Santaliz the officers had had considerable experience with drug transactions in the same location. However, in each of those cases the facts were deemed sufficient to establish probable cause for arrest. If the facts set out in Kennedy and Santaliz were sufficient to support

> a finding of probable cause, the facts established
> here were sufficient to establish reasonable
> suspicion" (emphasis supplied).

See also Commonwealth v. Santiago, 470 Mass. 574, 579 (2015) ("Although [the officer] did not see any item actually exchanged, the defendant's extended arm and [the recipient's] corresponding gesture in relation to his shirt pocket provided some basis for [the officer's] belief that a drug transaction between the two men had just taken place").

I also suggest that art. 14 of the Massachusetts Declaration of Rights does not require us to ignore completely the fact that the officers made their observations after receiving a tip that a green Volvo station wagon containing a "large" amount of drugs would be in the area of Waverly and Copeland Streets. Certainly, the tip by itself did not satisfy either prong required by the teaching of Aguilar-Spinelli.[3] However, viewing the tip as one of a number of factors contributing to reasonable suspicion does not, as the majority fears, impermissibly weaken the standard to a mere "totality of the circumstances." See Commonwealth v. Depiero, 473 Mass. 450, 452 (2016) ("[T]he information gleaned from the anonymous call in the present case, corroborated by other information, was sufficiently reliable to warrant a finding that the officer had

---

[3] See Aguilar v. Texas, 378 U.S. 108 (1964); Spinelli v. United States, 393 U.S. 410 (1969).

reasonable suspicion to stop the defendant's vehicle").  In this case, the tip was corroborated by the fact that someone driving a green Volvo station wagon engaged in what the officers reasonably suspected was a drug transaction some fifty feet up Waverly Street from the intersection of Waverly, Copeland, and Warren Streets.

The majority does not cite to any case holding that such a tip must be disregarded completely, and there are a number of other cases that hold otherwise.  See, e.g., Commonwealth v. Anderson, 461 Mass. 616, 623, cert. denied, 568 U.S. 946 (2012) ("Where the caller is anonymous, there are at least two ways to establish the caller's reliability.  The first is through independent corroboration by police observation or investigation of the details of the information provided by the caller.  See . . . Florida v. J.L., 529 U.S. 266, 270 [2000], quoting Alabama v. White, 496 U.S. 325, 327 [1990] [anonymous tip, suitably corroborated, may exhibit 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop']"); Commonwealth v. Wilson, 441 Mass. 390, 395-396 (2004) ("Independent police corroboration of the details in the telephone call by [the t]rooper . . . when he arrived at the location identified by the caller and saw a group of nine men establishes that the caller's information was also reliable. Commonwealth v. Willis, 415 Mass. 814, 819 [1993]").

Finally, the fact that the tip predicted a future event (the Volvo would arrive at the particular intersection containing drugs) also buttresses its credibility.  See Commonwealth v. Va Meng Joe, 425 Mass. 99, 104 (1997) ("Corroboration of future behavior, which goes beyond 'readily available information,' has a special significance when determining the reliability of an informant").

"For more than seventy-five years, we have avoided an overly formulaic approach to the determination of whether there is [reasonable suspicion to detain] a person who is suspected of participation in a street-level drug transaction."  Commonwealth v. Sanders, 90 Mass. App. Ct. 660, 660 (2016).  "'A police officer may make an investigatory stop "where suspicious conduct gives the officer reasonable ground to suspect that a person is committing, has committed, or is about to commit a crime." . . . The action of the officer "must be based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience."'  Commonwealth v. Gomes, 453 Mass. 506, 510-511 (2009), quoting Commonwealth v. Wilson, 441 Mass. [at] 394."  Commonwealth v. Stewart, 469 Mass. 257, 261 (2014).

While certainly, as the majority observes, there are many possible explanations for each of the facts individually (yes, the defendant could have been dropping off Celtics tickets, and yes, the defendant likely was nervous because there were several

police officers), police officers do "not have to exclude all the possible innocent explanations for the facts in order to form a reasonable suspicion." Commonwealth v. Isaiah I., 450 Mass. 818, 823 (2008). "Although nervous or furtive movements do not supply reasonable suspicion when considered in isolation, they are properly considered together with other details to find reasonable suspicion." Commonwealth v. DePeiza, 449 Mass. 367, 372 (2007). "We view the 'facts and inferences underlying the officer's suspicion . . . as a whole when assessing the reasonableness of his acts.' Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981). 'Seemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry.' Commonwealth v. Watson, 430 Mass. 725, 729 (2000)." Commonwealth v. Gomes, 453 Mass. at 511. "We do not examine each fact known to [police] at the time of the stop in isolation; instead we view the 'facts and inferences underlying the officer's suspicion . . . as a whole when assessing the reasonableness of his acts.'" Commonwealth v. Isaiah I., supra, quoting Commonwealth v. Thibeau, supra. I am satisfied that, in the case before us, all the facts together support the judge's conclusion that the exit order was properly grounded in reasonable suspicion.

2. Search. After the defendant got out of the Volvo, one of the police officers observed in plain view a roll of money

packaged in a clear plastic bag and tucked into the compartment on the inside of the driver's door.  This observation -- a large sum of cash -- together with the officers' reasonable suspicion that the defendant had just engaged in a drug transaction gave them probable cause to believe that the vehicle would contain evidence of the drug transaction, as well as evidence that the defendant was in possession of illegal drugs, intending to distribute them.  Compare Commonwealth v. Stephens, 451 Mass. 370, 385 (2008).  The police could then search the Volvo without a warrant under the motor vehicle exception.  See Commonwealth v. Johnson, 461 Mass. 44, 49-50 (2011).

I believe that the judge's order denying the motion to suppress should be affirmed.