SUPERIOR COURT 
 
 COMMONWEALTH VS. REIMON PENA

 
 Docket:
 1977CR0330
 
 
 Dates:
 August 31, 2020
 
 
 Present:
 /s/David A. Deakin Associate Justice
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ON DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE
 
 

             The defendant, Reimon Pena, is charged with one count of trafficking in fentanyl (G. L. c. 94C, § 32E(c)) and one count of carrying a dangerous weapon, a knife (G. L. c. 269, § 10(b)). The evidence that supports the indictments allegedly was collected during an automobile stop near the intersection of Erving Avenue and Jackson Street in downtown Lawrence on May 10, 2019. Pena was a passenger in an automobile driven by Jose Mercado. Pena initially brought a Motion to Suppress Evidence (Paper No. 5), which alleged that the trooper's detention of the two men exceeded the permissible scope of a traffic stop. Pena subsequently filed this Amended Motion to Suppress Evidence ("Motion") (Paper No. 12), contending that the Massachusetts State Trooper who stopped the car, in which Pena was a passenger, did so because of the driver's race and/or his race.[1] A hearing on the Amended Motion was held on August 5, 2020. Four witnesses testified. The Commonwealth called Massachusetts State Police Trooper Jennifer Penton, and the defense called Mercado, Professor Anne-Marie Hakstian, and Carrie Alvino.
---------------------------
[1] The defendant's original Motion to Suppress Evidence (Paper No. 5), filed on November 6, 2019, did not include the allegation that the automobile stop was the result of racial profiling. The Amended Motion to Suppress Evidence (Paper No. 12) added this claim, presumably based on discovery received and/or reviewed after the filing of the original motion. Aside from the additional claim, the motions are identical.
                                                            -1-
            After both sides rested, the court found that Hakstian's testimony was sufficient to raise "at least a reasonable inference of impermissible discrimination" in the stop of the vehicle. Commonwealth v. Lora, 451 Mass. 425, 440 (2008). The Commonwealth had requested that, if the court made such a finding, the Commonwealth be given the opportunity to introduce rebuttal testimony on the issue. The court permitted the Commonwealth to do so but suggested that the parties bifurcate the proceedings and proceed to argument on the aspects of the stop and search that are not dependent on the claim of selective enforcement. The parties agreed, and argument on these questions was heard on August 18, 2020.
            Because the court concludes that Penton's request to the driver to step out of the vehicle to speak with her, and her ensuing search of the defendant, who was a passenger in the vehicle, and of the vehicle were unconstitutional, the Motion to Suppress is ALLOWED.
FACTS[2]
            On May 10, 2019, Trooper Jennifer Penton of the Massachusetts State Police pulled over a 2007 Honda CRV (Massachusetts Registration 4ZE 441) driven by Jose Mercado. Pena was riding in the front passenger seat. Penton, an experienced law enforcement officer, was patrolling in downtown Lawrence as part of a "zero-tolerance" operation. According to Penton, the mayor of Lawrence (like the mayors or chief executives of other municipalities) regularly invites the Massachusetts State Police to come into the city and provide an active, visible law enforcement presence. Penton explained that, under the "zero-tolerance" approach, she was encouraged to take the most aggressive, permissible approach to enforcing all laws.
---------------------------
[2] The facts are taken from witness testimony at the August 5, 2020, hearing on the Defendant's Amended Motion to Suppress Evidence (Paper No. 12). The court's recitation of a fact reflects that the court has credited the account of the witness(es) who testified to it. To the extent that there was a conflict in testimony, that is noted in the facts section, and, where possible, the court has resolved the conflict. Such resolutions are also noted in the facts section.
                                                            -2-
            Shortly before 4:48 p.m. on May 10, Penton was patrolling on a side street off Erving Avenue in Lawrence. She was in full uniform and driving a marked State Police cruiser. She testified that, as she was driving on the side street, she saw the Honda CRV travelling from her right to her left on Erving Avenue, the cross street ahead of her. It was "overcast and raining," and Penton noted that the CRV's windshield wipers were on, but its headlights were not.[3] She testified that she turned left onto Erving Avenue, turned on her emergency lights, and pulled behind the CRV. Penton further testified that, after the CRV did not pull over for several blocks, she turned on her siren. At that point, the CRV pulled over at the intersection of Erving Avenue and Jackson Street. Mercado testified that he pulled over as soon as he became aware of the trooper behind him.
            It appeared to Penton that there were two men in the CRV, one driving and one in the front passenger seat. She got out of her cruiser and approached the CRV. She asked the driver, whom she soon identified as Mercado, for his driver's and license and registration. He provided them. His license identified him correctly; the registration was in the name of "a third party." Mercado testified that the CRV belonged to his girlfriend. Penton noticed at this point that the passenger, Pena, was not wearing a seatbelt. She asked him for identification, and he produced a "health card." Penton explained, in English, that this was not the type of identification she meant. Pena did not provide any other identification, but Penton saw an identification card in his wallet (as he looked through it) and asked for it. Pena handed the trooper an identification card issued by the Dominican Republic that identified him correctly. Pena appeared to Penton to be nervous and avoided eye contact with her.
---------------------------
[3] The distinction between headlights and daytime running lights became the source of significant, material dispute. The contours of that dispute are critical to, and therefore set out in detail in, Section I of the text, infra.
                                                            -3-
            After this interaction, Penton went back to her cruiser to run necessary checks.[4] She found that Mercado's driver's license was active. Despite finding what she described as an extensive criminal history — including pending felony cases — Penton found no warrants pending for Mercado. She testified that Pena, too, had "a criminal history," but no active warrants. Nothing about the checks indicated that either man then was involved in criminal activity. As she was running the checks, she could see the two men in the CRV speaking to each other "rapidly." At about the same time, a Lawrence Police officer, stopped and asked Penton if she needed help. She asked him to pull his cruiser behind hers, and he did.
            At this point, Penton determined that she wanted to speak with Mercado (the driver) "out of earshot" of Pena (the passenger). She again approached the driver's side of the CRV and "asked" Mercado if he would "mind" speaking to her. He replied, "I don't mind," or words to that effect. Penton then asked Mercado to get out of the CRV and join her on the sidewalk. At the hearing, Mercado confirmed that Penton had asked to speak with him, but he explained that he did not feel that he had an option to refuse. He noted in this context that Penton was a state trooper. Penton then asked Mercado a series of questions about Pena. She asked him how long he had known Pena, and Mercado answered that they had known each other for roughly one year. Penton then asked Mercado how he had met Pena; he responded that it had been "through a friend." Mercado told Penton that he could recall neither the friend's name nor where the initial
---------------------------
[4]There was a conflict in testimony here. Penton testified that she went back to her cruiser only after obtaining identification from both men. Mercado testified that the trooper went back to her cruiser after taking his license and registration and that it was only after she went back to her cruiser that she came back to the car and requested information from Pena. The court credits Penton's account of the order of events as she appeared much more confident in her memory of this point than did Mercado. The court does not find any effort by Mercado to mislead intentionally. Rather, it appeared to the court that he was not entirely certain of the order of events. In light of the court's resolution of the issues (see text, infra) the precise order of events does not appear to be material, in any event.
                                                            -4-
meeting had taken place. She then asked Mercado, "can I search your car" or words to that effect. Mercado replied, "[g]o ahead; I don't mind; there's nothing in there," or something close to that. Mercado testified that, once again, he did not feel free to refuse, despite acknowledging that he told Penton that he would not "mind" if she searched the CRV.
            Preparing to search the automobile, Penton next addressed Pena, who was still seated in the front passenger's seat. She asked him whether he had any weapons or tools that might be used to harm her. He responded that he had a knife in his waistband and went to remove it. Penton instructed him not to do that and that she would prefer to remove it, which she did. She then pat-frisked Pena, still seated in the CRV, to search for additional weapons. As she did so, she felt what she believed — based on her experience and training — to be a packet of drugs in the right, front pocket of the windbreaker he was wearing. Penton then told Pena to "step out" of the CRV, which he did. She then handcuffed and "searched" him.[5] From the right, front pocket of his windbreaker, Penton recovered a packet that appeared to her, again based on her training and experience, to be six packets of fentanyl. She also recovered a total of $1,249.00 in mixed-denomination currency from several of Pena's pockets. She then placed him under arrest.
            At this point in the interaction, Penton issued Mercado a citation for failing to activate his headlights while his windshield wipers were on. She told him that Pena would be arrested and explained to him that Pena would be taken to a "mobile booking location" that the State Police
---------------------------
[5] Penton testified that the search that she conducted was significantly "different" from — and much more extensive than -- the "pat-frisk," which she had conducted while Pena was still seated in the CRV.
                                                            -5-
had set up as part of the "zero-tolerance" operation. She called for an Essex County Sheriff's transport vehicle to take Pena there. She then searched the CRV.[6]
PROCEDURAL HISTORY 
            The grand jury returned the two-count indictment in this case on July 17, 2019, and Pena was arraigned on October 16, 2019. On November 6, 2019, Pena filed his original Motion to Suppress Evidence (Paper No. 5). It challenged the validity of the automobile stop and the subsequent search of Pena. On March 5, 2020, Pena filed an Amended Motion to Suppress Evidence (Paper No. 12). It incorporated the challenges to the motor vehicle stop and added a claim that the stop and search were the products of impermissible selective enforcement.
            A hearing was held on the Amended Motion on August 5, 2020. At the beginning of the hearing, the Commonwealth explained that, in the event that the court found that Pena had met his burden of presenting evidence legally sufficient to raise a claim of selective enforcement, it would request a continuance in order to present rebuttal evidence on that issue. The court indicated that, if it made such a finding, it would allow the requested continuance.
            At the conclusion of the hearing, the court suggested that the hearing be bifurcated — with the parties briefing the issues pertaining to the stop itself and deferring on the issue of selective enforcement. The parties agreed and submitted memoranda of law addressing the validity of the stop and search. This memorandum of decision addresses that issue.
ANALYSIS
            A police officer who observes a traffic violation may stop an automobile to issue a citation. See Commonwealth v. Santana, 420 Mass. 205, 207 (1995). Section 15 of chapter 85 of
---------------------------
[6] The record does not reflect what, if anything, of significance was recovered during the search of the CRV.
                                                            -6-
the Massachusetts General Laws requires drivers to illuminate their "headlights and taillights" under a variety of circumstances, including "when the vehicle's windshield wipers are needed . . ." G. L. c. 85, § 15.[7] A police officer who observes a violation of the statute has the authority to stop the driver to issue a citation. See Commonwealth v. Feyenord, 445 Mass. 72, 75 (2005) (approving daytime stop of driver and citation for an inoperable headlight, in violation of G. L. c. 90, § 7). That a police officer suspects that the occupants of an automobile may be involved in criminal activity does not invalidate the stop, provided that its circumstances would justify the police officer in making it. Santana, 420 Mass. at 208 ("[T]hat the troopers may have believed that the defendants were engaging in illegal drug activity does not limit their power to make an authorized [automobile] stop.") The standard is one "of objective reasonableness without regard for the underlying intent or motivation of the officer[] involved." Id., quoting, inter alia, Commonwealth v. Ceria, 13 Mass. App. Ct. 230, 235 (1982).
            A police officer's detention of a motorist "to issue a traffic citation . . . must 'last no longer than reasonably necessary to effectuate the purpose of the stop.'" Commonwealth v. Cruz, 459 Mass. 459, 465 (2011). See also Rodriguez v. United States, 575 U.S. 348, 354, 135 S. Ct. 1609, 191 L.Ed.2d 492 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed."). Extension of the stop beyond the period necessary to issue the citation requires a reasonable articulable suspicion that the driver and/or passengers is/are engaged in criminal conduct. See Cruz, 459 Mass. at 466, quoting, inter
---------------------------
[7] In relevant part, G. L. c. 85, § 15 provides: "[a] vehicle, whether stationary or in motion, on a public way, shall have attached to it headlights and taillights which shall be turned on by the vehicle operator and so displayed as to be visible from the front and rear during the period of V2 hour after sunset to V2 before sunrise; provided, however, that such headlights and taillights shall be turned on by the vehicle operator at all other times when, due to insufficient light or unfavorable atmospheric conditions, visibility is reduced such that persons or vehicles on the roadway are not clearly discernible at a distance of 500 feet or when the vehicle's windshield wipers are needed . . . ."
                                                            -7-
alia, Feyenord, 445 Mass. at 77 (expansion of scope of traffic stop "must be based on 'specific and articulable facts and the reasonable inferences which follow from such facts in light of the officer's experience"). See also Rodriguez, 575 U.S. at 355 (police officer may not "prolong[] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").
            Under limited circumstances, a search of an automobile during a traffic stop can be justified by consent. See Commonwealth v. Buckley, 478 Mass. 861, 875 (2018), citing Commonwealth v. Buswell, 468 Mass. 92, 105 (2014). Consent must be "freely and voluntarily given, . . . meaning it was 'unfettered by coercion, express or implied.'" Buckley, 478 Mass. at 875 (citations omitted), quoting, inter alia, Commonwealth v. Harmond, 376 Mass. 557, 561 (1978). The Commonwealth bears the burden of proving that the extension of the stop and the search were consensual. Id. The voluntariness of the consent "is a question of fact to be determined in the circumstances of each case." Id., quoting, inter alia, Harmond, 376 Mass. at 561. However, "consent obtained during an illegal detention is ineffective to justify an otherwise invalid search." Commonwealth v. Cordero, 477 Mass. 237, 238 n.1 (2017), quoting Commonwealth v. Torres, 424 Mass. 153, 158 (1997). If a police officer extends the duration of a stop beyond that required to effectuate the stop's legitimate purpose, the driver's consent given thereafter is invalid. See id.
I. The basis for the stop: the headlight violation
            The Commonwealth maintains that, because Penton saw that the CRV's windshield wipers were on (as were those of other motorists) but its headlights were not, she had an objectively reasonable basis to stop Mercado and issue him a citation for a violation of G. L. c. 85, § 15. Pena responds that, because the CRV is equipped with daytime running lights, the court
                                                            -8-
should discredit Penton's testimony that the headlights were not activated. Because neither party asked Penton to elaborate on her testimony that the CRV's headlights were not activated, the question is probably more complicated than it should have been. In the end, however, there is no evidence to contradict Penton's account that the CRV's headlights — as distinguished from its daytime running lights — were not on. Indeed, Mercado himself testified that he had not turned on his headlights. Under the circumstances, the court concludes that the Commonwealth has established by a bare preponderance of the evidence that Penton was warranted in stopping Mercado to issue him a citation for a violation of G. L. c. 85, § 15.
            It is uncontested that the CRV's headlights were not on when Penton saw it drive past her on a crossstreet. It appears very likely — and therefore the court finds by a preponderance of the evidence — both that the CRV's daytime running lights were on and that its taillights were not on at the time Penton stopped it. Mercado testified, and the excerpt from the Honda owner's manual for the CRV (Ex. 6) corroborates, that the CRV was equipped with daytime running lights. Additionally, former Massachusetts State Trooper Carrie Alvino testified that she examined the CRV sometime after the stop and found that the daytime running lights were operational. The evidence established that the daytime running lights come on when the CRV is started but the headlights are not activated. The evidence, however, does not establish whether the taillights are illuminated when the CRV is started but the headlights are not activated.[8] This is potentially significant because Alvino testified that, although headlights and daytime running lights are not the same (and, by implication, headlights are brighter), it is "almost impossible" to distinguish them from each other unless an observer is offered a side-by-side comparison. In light of the
---------------------------
[8] The CRV's owner's manual makes clear — unsurprisingly to anyone who has driven, or ridden in, an automobile at night — that the taillights are activated when the headlights are turned on. See Ex. 6.
                                                            -9-
court's own experience as a driver, the court credits Alvino's uncontested testimony on this point.
            The court finds, however, that activation of the daytime running lights does not result in activation of the taillights.[9] Although Penton at least twice indicated that the CRV attracted her attention because it had "no headlights" on, at other times, she indicated that, when she saw the CRV, its "lights" were not on. In this context, Alvino testified that the daytime running lights are housed in the same "front headlamp assembly" that houses the headlights. Although Alvino did not testify affirmatively that activating the daytime running lights does not also activate the taillights, that is consistent with her testimony. Additionally, the CRV's owner's manual specifically notes that activation of the headlights "turns on the parking lights, taillights, instrument panel lights, side-marker lights, and rear license plate light." (Ex. 6). In contrast, the manual explains that the "[d]aytime [r]unning [1]ights" come on when the headlight switch is in the off or intermediate position (lights, including taillights, on but headlights off) and the engine is turned on. There is no suggestion in the section on daytime running lights that their activation also activates the taillights.
            Thus, it is certainly possible that Penton — who first saw the CRV as it drove perpendicularly to her, from right to left — saw that its "lights," meaning headlights and taillights (as required by the statute), were not on. Had the record been made more clear, the court might
---------------------------
[9] The Commonwealth cites Commonwealth v. Dosouto, 82 Mass. App. Ct. 474, 476 (2012) for this proposition. In that case, a Milton Police patrolman saw a car driving by him at night "with only its 'daytime running lights on . . . so the back of the vehicle was totally dark to anyone else coming up on it.'" Dosouto, 82 Mass. App. Ct. at 476. That a Milton patrolman testified to this effect in Dosouto, however, does not permit this court to consider that testimony substantively in this case.
                                                            -10-
well know this with greater certainty. That said, in his testimony, Mercado did not claim that his headlights were on.[10]
            The court thus concludes, by a preponderance of the evidence, that the CRV's windshield wipers were on, and its headlights and taillights were not. It is not clear from the record how Penton knew that the headlights were not on — that is, whether she would have testified that she was able to tell the difference between the CRV's headlights and daytime running lights, whether she noted that the taillights were not on, or both. As G. L. c. 85, § 15, requires that both headlights and taillights be on when windshield wipers are necessary, and as the evidence indicates — again, by a preponderance of the evidence — that neither the headlights (as distinguished from daytime running lights) nor the taillights were on, Penton had an objectively reasonable basis to stop the CRV for violation of the statute.
II. The scope of the stop
            In addition to challenging the legality of the stop, Pena also contends that the search of the CRV — and his resulting pat-frisk, removal from the vehicle, and search — exceeded the permissible scope of a routine traffic stop. The Commonwealth responds that Penton's requests that Mercado get out of the car to speak with her and that he consent to a search of the CRV were consensual and, thus, permissible. In assessing whether an automobile stop exceeded its
---------------------------
[10] Mercado testified, and the court credits, that he was unaware that the daytime running lights, which were activated as soon as the car was started, did not comply with the requirements of G. L. c. 85, § 15. Although it seems that he was mistaken in this view — particularly as it appears that the daytime running lights do not activate the taillights, as the statute requires — it is an understandable mistake. Prior to conducting the research for this decision, this court would not have been able to say with confidence whether daytime running lights satisfy the statutory requirements during daytime rains, and the court suspects that it is far from alone in this ignorance. Particularly because of this, the court is concerned that this is not the type of automobile stop that even the rigorous standard of a "zero tolerance" patrol requires. The court notes that the Supreme Judicial Court has observed that "routine traffic stops may also pose unique hardships on minorities who, it has been argued, are often the subject of stops on pretext." Commonwealth v. Gonsalves, 429 Mass. 658, 663 (1999).
                                                            -11-
permissible scope, proportionality is the touchstone. See Commonwealth v. Buckley, 478 Mass. 861, 873 (2018) ("In evaluating whether the police exceeded the permissible scope of a stop, the issue is one of proportion."), quoting Commonwealth v. Sinforoso, 434 Mass. 320, 323 (2001). At the same time, "[i]t is well settled that a police inquiry in a routine traffic stop must end when the purpose of the stop is accomplished unless the police have grounds for inferring that either the operator or his passengers were involved in the commission of a crime or engaged in other suspicious conduct." Cordero, 477 Mass. at 241 (internal quotations omitted). The standard is reasonable articulable suspicion. See id. at 243. Something more than a "hunch" that the driver and/or passengers are involved in criminal activity is required. Commonwealth v. Wren, 391 Mass. 705, 707 (1984).
            The Commonwealth concedes that the information available to Penton after she ran a computer check of Mercado's driver's license and automobile registration information and Pena's identification did not amount to reasonable articulable suspicion of criminal activity. At that point, Penton knew that: 1) the driver had committed a violation of G. L. c. 85, § 15; 2) the driver had failed to stop for several blocks after she activated her cruiser's take-down lights (although he apparently stopped appropriately when she turned on her siren); 3) both men had criminal histories, and Mercado had open cases (although neither man had active warrants); 4) Pena did not immediately provide her with proper proof of identity (although he handed over his Dominican Republic identification when she pointed it out to him);[11] 5) Pena appeared nervous and avoided eye contact with her; and 6) the two men talked to each other "actively" while she was in her cruiser running the computer check. Although this information certainly could be the
---------------------------
[11]As Pena required an interpreter for the hearing, there is a very real possibility that his proffer of a health care card when asked by Penton for identification was the result of a miscommunication and/or misunderstanding. Penton testified that Pena spoke to her in English, but neither party explored the extent of his ability to speak and understand English.
                                                            -12-
basis for a reasonable intuition that the pair might be involved in criminal activity, none of these facts — individually or taken as a whole — amounts to reasonable articulable suspicion that they were.
            The Commonwealth does not contest the point. Instead, it contends that the extension of the traffic stop was justified by Mercado's consent both to get out of the CRV to speak with Penton and then to permit her to search the automobile. The fatal difficulty with this position is that Penton extended the duration of the routine traffic stop beyond the time necessary to complete the citation process, and she did so without reasonable articulable suspicion that Mercado and/or Pena were involved in criminal activity. See Commonwealth v. Tavares, 482 Mass. 694, 703 (2019) ("Where an officer conducts 'an uneventful threshold inquiry giving rise to no further suspicion of criminal activity, [t]he [officer] may not prolong the detention or expand the inquiry.")), quoting Buckley, 478 Mass. at 873. As the Supreme Judicial Court has explained, "[c]itizens do not expect that police officers handling a routine traffic violation will engage, in the absence of justification, in stalling tactics, obfuscation, strained conversation or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime." Commonwealth v. Gonsalves, 429 Mass. 658, 663 (1999). See also Tavares, 482 Mass. at 706 (same). The facts known to Penton at the time that she sought to speak with Mercado out of Pena's earshot (see supra) did not amount to a reasonable articulable suspicion that either man was involved in criminal conduct, as the Commonwealth necessarily concedes. There was, therefore, no justification for her to extend the stop well beyond the period necessary to issue citations, and the evidence recovered after the "request" to Mercado to get out of the CRV and speak with Penton must be suppressed.
                                                            -13-
Because Penton extended the scope beyond the period necessary to issue the citation, the Commonwealth cannot rely on Mercado's consent — to get out of the car to speak with Penton and for her to search his car — to justify the expansion of the stop. "[C]onsent obtained during an illegal detention is ineffective to justify an otherwise invalid search." Cordero, 477 Mass. at 238 n.1, quoting Torres, 424 Mass. at 158. As in Cordero, because the prolonged detention of Mercado and Pena in this case, beyond the period necessary to issue citations, "was unconstitutional, any consent given during the illegal seizure was invalid." Id. Moreover, the Commonwealth's argument at the hearing — that a police officer is always permitted to initiate a consensual conversation with a citizen — is unavailing in the context of an automobile stop. Once Mercado and Pena were stopped, and therefore seized, "the interrogation of [Mercado] . . . could not . . . be upheld on the line of cases that permit police examination of a person (including a request for identification) that is consensual in nature." Torres, 424 Mass. at 158 (first ellipses added; second ellipses and parentheses in original). This is because, in cases in which police officers approach someone who is not seized, "the police do not convey a message that compliance with their requests is required, and consequently, the encounters invoke no restraint on the person's liberty." Id. In cases involving automobile stops, however, there is a seizure at the outset of the encounter. See Tavares, 482 Mass. at 702 ("A motor vehicle stop constitutes a seizure of all individuals detained in the stop."), citing Whren v. United States, 417 U.S. 806, 809-810, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1986); Rodriguez, 476 Mass. at 773. Thus, the principle that a police officer's encounter with a citizen outside the context of a seizure "invoke[s] no restraint on the person's liberty" does not apply in the circumstances of a motor vehicle stop. See Torres, 424 Mass. at 158.
                                                           -14-
            The holding in Buckley, 478 Mass. at 873-876, is not to the contrary. In that case, there was "nothing in the record to indicate that the 'tasks tied to the traffic infraction . . . [were already] complete . . . by the time [detectives] . . . arrived, or that . . . [the officer conducting the stop] unnecessarily prolonged the stop to await the detectives' arrival." Buckley, 478 Mass. at 873-874 (initial ellipses and parentheses in original; subsequent ellipses and parentheses added), quoting Rodriguez, 575 U.S. 348, 135 S. Ct. 1609, 1614, 191 L.Ed.2d 492 (2015). The Supreme Judicial Court in Buckley, therefore, expressly did not have to confront the rationale in Cordero, 477 Mass. at 242, that "[t]he police do not earn 'bonus time' to conduct additional investigations by an expeditious performance of the traffic-related investigation." (internal quotation marks in original). Because Penton conceded that she had completed all the work required to issue Mercado and Pena citations (for a violation of c. 85, § 15, and a seatbelt violation, respectively), the holding in Buckley is inapplicable to this case.
            Even if Penton could have extended the stop based on consent, however, the Commonwealth has not established that the consent that Mercado apparently gave — to speak further with the trooper and to allow her to search his car — was "unfettered by coercion, express or implied" and was not simply an "acquiescence to a claim of lawful authority." Commonwealth v. Carr, 458 Mass. 295, 302 (2010), quoting, inter alia, Commonwealth v. Walker, 370 Mass. 548, 555, cert. denied, 429 U.S. 943, 97 S. Ct. 363, 50 L.Ed.2d 314 (1976). In making this determination, a court must consider factors including: "the presence of armed, uniformed officers; whether the defendant was informed of his right to refuse consent; the age, intelligence, and other personal characteristics of the [individuals involved] . . . ; and whether the [individuals involved were] . . . in custody when consent was given." Id., citing Commonwealth v. Sanna, 424 Mass. 92, 97-98 n.10 (1997); Commonwealth v. Harmond, 376 Mass. 557, 561-562 (1978). The
                                                            -15-
first two of these factors clearly counsel against a finding of consent. There were two uniformed police officers present at the time of the detention, and neither Penton nor Mercado testified that she told him that he could refuse to speak to her.
            It is somewhat less clear how the third and fourth factors should guide the court's analysis. The record indicates that Mercado had a criminal history, although the extent of that history — and the degree to which his experiences with law enforcement gave him an understanding of his right to refuse to speak with the trooper and/or allow her to search the CRV — are not clear from the record.[12] Mercado testified, and the court credits, that he did not understand that he had a choice because Penton was a state trooper. Under the circumstances in this case, it is not at all clear to the court that Mercado's apparent consent was anything more than an understandable acquiescence to the authority of the trooper. Finally, as to the fourth factor, although Mercado and Pena were not in custody at the time that Penton asked Mercado to step out of the CRV to speak with her and then asked him for permission to search the automobile, they had been seized. The court concludes that a driver in Mercado's circumstances who had been pulled over by a Massachusetts State Trooper might well be understandably hesitant, and likely reluctant, to refuse the officer's request — however phrased — to step out of the car to speak with the trooper.
            The law is clear that, absent reasonable articulable suspicion (which the Commonwealth has conceded Penton did not have), Penton could not constitutionally extend the stop beyond the period necessary to issue citations. The law is equally clear that an otherwise unconstitutional stop cannot be justified by a claim of consent. See Torres, 424 Mass. at 163 NAP of the evidence seized after the primary illegality — the continued detention of both men [driver and
---------------------------
[12] There was no evidence introduced, for example, as to whether Mercado had ever been interviewed by police before the automobile stop in question.
                                                            -16-
passenger] after [the driver] ... had produced a valid license and registration — should be suppressed as the fruit of the poisonous tree because a consent obtained during an illegal detention is ineffective to justify an otherwise invalid search."). Finally, under the circumstances of this case, the Commonwealth has not met its burden of establishing that Mercado's apparent consent was "unfettered by coercion, express or implied." Buckley, 478 Mass. at 875. In light of its ruling, the court need not reach Pena's claim of selective enforcement.
CONCLUSION AND ORDER
            For the foregoing reasons, the defendant's Motion to Suppress is ALLOWED.
@/s/David A. Deakin Associate Justice
@August 31, 2020
                                                            -17-
xxz